## COMMONWEALTH *vs.* JOSEPH GALL.

No. 01-P-5.

Suffolk. February 7, 2003. - June 10, 2003.

Present: PORADA, KAPLAN, & COHEN, JJ.

*Larceny. False Pretenses. Uttering Forged Instrument. Insurance,* Certificate of insurance, Workers' compensation insurance.

At the trial of an indictment charging the defendant, the president of an employee leasing company, with larceny by false pretenses, the evidence was sufficient to show that the defendant knowingly submitted false payroll information in order to obtain a workers' compensation policy at a lower premium; that the defendant intended the workers' compensation assigned risk pool administrator and the assigned private insurer to rely on the falsehoods; that they did so rely; and that they parted with a valuable insurance policy and valuable services to support that policy at a premium far lower that what they were entitled to receive. [285-288]

At the trial of indictments charging the defendant with uttering forged instruments in violation of G. L. c. 267, § 5, the Commonwealth failed to prove that informational insurance certificates, which the defendant provided to its client companies, and which did not purport to reflect individual contract rights or additional insured status for those client companies constituted "polic[ies] of insurance" for purposes of G. L. c. 267, § 1. [288-290]

INDICTMENTS found and returned in the Superior Court Department on December 19, 1994.

The cases were heard by *E. Susan Garsh*, J.

*Brian J. Kelly* for the defendant.

*David R. Marks*, Assistant Attorney General (*Eliot J. Green*, Assistant Attorney General, with him) for the Commonwealth.

COHEN, J. After a fifteen-day jury-waived trial in the Superior Court, the defendant was convicted of one count of larceny by false pretenses of an amount over $250, in violation of G. L. c. 266, § 30, and twenty-five counts of uttering forged instruments, in violation of G. L. c. 267, § 5. These charges, and

others,[1] arose from the defendant's operation of an employee leasing business. The thrust of the case was that the defendant knowingly submitted false, understated payroll information in order to obtain a workers' compensation policy at a reduced premium, and created and distributed false certificates of insurance to conceal his scheme. On appeal, the defendant claims that his motion for required findings of not guilty should have been allowed. We conclude that the evidence was sufficient to sustain the larceny conviction, but that the uttering convictions must be reversed because the Commonwealth did not prove that false documents tendered by the defendant were among those specified by statute as a basis for the crime.

1. *The evidence.* We summarize the Commonwealth's evidence, taken in the light most favorable to the prosecution. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

The defendant was the president of a Connecticut-based company called Employee Staffing of America, Inc. (ESA), and was the person in control of its day-to-day operations. ESA was in the business of providing client companies with employee leasing services, meaning that, for a weekly fee, ESA would become the official, legal employer of its clients' workers and then lease the workers back to the clients. Under this arrangement, ESA assumed the client companies' payroll and employee benefit functions, such as the payment of withholding and unemployment taxes and the provision of workers' compensation insurance.

In marketing its services, ESA would emphasize that it could

---

[1]The defendant also was convicted of one count of failure to provide workers' compensation insurance or licensed self-insurance, in violation of G. L. c. 152, § 25C, but he does not challenge this conviction on appeal. Ten additional counts of larceny resulted in acquittal. Required findings of not guilty entered as to twenty-five counts of forgery on jurisdictional grounds, because the forgeries did not take place in Massachusetts. Essentially the same business practices also gave rise to a Federal prosecution in the District of Connecticut, where the defendant was convicted on all counts of a twenty-four count indictment alleging conspiracy, mail fraud, wire fraud, making false statements to federally insured financial institutions and wilful failure to file income tax returns. His Federal appeals were unsuccessful. See *United States* v. *Stevens*, 210 F.3d 356 (2d Cir. 2000), cert. denied sub nom. *Gall* v. *United States*, 531 U.S. 1101 (2001). See also *United States* v. *Stevens*, 211 F.3d 1 (2d Cir. 2000) (upholding postconviction restitution order).

save its clients considerable amounts of money by taking over their workers' compensation obligations. As the defendant was heard to explain, loss history is a factor in computing workers' compensation insurance premiums, and many of ESA's client companies had high experience modification rates. By obtaining coverage at its own, lower rate, ESA could pass some of the savings on to its clients, and still make a profit.[2]

From July 25, 1990, to April 1, 1991, ESA maintained workers' compensation coverage under an insurance policy issued by National Union Fire Insurance Company (National Union). This policy was effective in a number of States, including Massachusetts, where ESA had assumed employer status with respect to the workers of between 150 and 200 client companies. On April 1, 1991, the National Union policy expired and was not renewed for reasons not relevant here.

Upon learning of the nonrenewal of the National Union policy, the Massachusetts Department of Industrial Accidents (DIA) notified ESA that it had become aware that ESA was losing its coverage. In April and May, 1991, with replacement insurance still not in place, the DIA informed ESA and its attorney that unless ESA soon applied for substitute coverage, the DIA would issue stop work orders to each of ESA's client companies in Massachusetts. ESA's attorney responded by telephoning the manager of DIA's division of insurance and DIA's general counsel to inform them that ESA was using a plan pursuant to the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. (ERISA), to fulfil its workers' compensation obligations in Massachusetts, and that it was entitled to do so because ERISA preempted State law. Both the manager of DIA's division of insurance and its general counsel separately told ESA's attorney that, as far as they knew, ESA

---

[2]This anomaly subsequently was corrected by statute and regulation. See G. L. c. 152, § 14A, added by St. 1991, c. 398, § 38A; 211 Code Mass. Regs. § 111 (1993). Pursuant to these reform measures, premiums for workers' compensation policies issued to employee leasing companies are now required to be calculated to reflect the exposure and anticipated claim experience of the client companies. Moreover, anyone "who knowingly misclassifies employees or engages in deceptive employee leasing practices for the purpose of avoiding full payment of insurance premiums" is now subject to criminal penalties. See G. L. c. 152, § 14(3), added by St. 1991, c. 398, § 38.

had only two viable options for providing workers' compensation protection in Massachusetts: it could either obtain an insurance policy or become a licensed self-insurer, as provided in G. L. c. 152, § 25A. In response, ESA's attorney wrote to the DIA, reiterating ESA's position that an ERISA plan was an appropriate mechanism (but without providing DIA with any plan documents to review) and offering to apply for an insurance policy on an interim basis.

Thereafter, the defendant turned to the assigned risk pool (pool) in an effort to secure Massachusetts workers' compensation coverage. The pool, which is administered by the Workers' Compensation Rating and Inspection Bureau (WCRIB), was established to be a source of workers' compensation insurance for employers who are unable to obtain coverage from the voluntary market. It is funded by assessments against all of the licensed workers' compensation carriers in Massachusetts, thereby spreading the costs associated with providing coverage to high risk insureds. When an employer is approved by WCRIB for pool coverage, WCRIB assigns a private insurer in the Massachusetts market to issue the policy, collect the premiums, pay the claims and generally service the policy. For its trouble, the assigned carrier receives a percentage of the premium collected as a servicing fee, but the ultimate liability for claims is borne by the pool. To be eligible for pool coverage, an employer must demonstrate that it has been rejected for coverage by two insurers in the voluntary market and that it owes no outstanding premiums. The employer also must provide WCRIB with accurate underwriting data, such as information about its total payroll, employee job classifications, and other business interests, so that WCRIB can assess the risk and compute an appropriate premium.

Between May 20 and August 22, 1991, the defendant oversaw the preparation of four applications for pool coverage, which were submitted to WCRIB through an insurance broker, Salvatore Cantone. Cantone was relatively inexperienced in obtaining such coverage and took at face value the information supplied by the defendant and other ESA employees acting at the defendant's direction. Each of the applications was received and reviewed by Ralph Bowdridge, vice-president of operations at WCRIB.

Bowdridge returned the first application to Cantone because, among other things, additional information was needed about ESA's relationship to another business listed on the application, and because information was desired about each entity to whom ESA leased employees. He also rejected the second application, which listed ESA's total annual payroll as $2,498,834.95, but failed to break that figure down. Also, a question about ESA's ownership of other business interests was left blank. Still uncertain about the extent of the risk, Bowdridge requested copies of the quarterly payroll reports filed by ESA and each of its client companies with the Massachusetts Department of Employment and Training (DET) in conjunction with those entities' payment of unemployment compensation taxes.

After the second application was returned to Cantone, he informed Bowdridge (at the defendant's instigation) that ESA had estimated its payroll incorrectly, by using a quarterly figure instead of an annual figure, and that the figure on the rejected application should be adjusted accordingly. Cantone then sent Bowdridge a letter with several attachments provided by ESA, including one that showed an annual payroll of $7,496,504.48. Cantone also forwarded to Bowdridge ESA's DET payroll report for the quarter ending June 30, 1991, in which ESA reported a quarterly payroll of $1,909,364. However, the DET report did not accurately reflect ESA's Massachusetts payroll at the time, as ESA had falsely reported some of its own payroll under the company name of an inactive affiliate, in an effort to reduce ESA's unemployment insurance costs.

ESA's third application was still lacking in particulars. ESA continued to represent that its annual payroll was just under $7.5 million, but still did not provide detailed data about its client companies. Again, as part of his continuing efforts to get a complete understanding of the risk, Bowdridge returned the application to Cantone, requesting supplemental information about each client company. Cantone passed these requests along to the defendant.

ESA submitted its fourth and final application for coverage to WCRIB on August 21, 1991. This application included, as back-up for ESA's payroll estimate, the false DET report for the quarter ending June 30, 1991. It also listed thirty-two client

companies and included separate application information for each of these clients. Enclosed with the application was a copy of a letter to Cantone, dated August 19, 1991, that was signed by ESA's sales manager, Keith Trapasso,[3] but written by the defendant. The letter stated:

> "[I]n reference to Ralph Bowdridge's comments and his letter to you dated August 13th[,] there may be additional clients whose data was not included but with good reason. These clients are contemplating the option of providing their own workers' compensation coverage and for those who do not, the appropriate data will be submitted within one week or two weeks.
>
> "However, that aside we do not expect in any way whatsoever to have the state fund provide coverage for any individual not working at one of the [sites] encompassed by the list of clients hereto attached. Hence the fund will never have an exposure beyond the employees or clients so listed in advance."

This letter was false. As Trapasso testified at trial, ESA did not have any clients who were thinking about getting their own workers' compensation coverage. Rather, as he learned from conversations with the defendant, the defendant deliberately chose not to disclose all of ESA's client companies, leased employees, job classifications, and payroll so that he could minimize the amount of ESA's up-front premium. According to Trapasso, the defendant was well aware from conversations with Cantone that he should have disclosed ESA's entire payroll and all of its client companies. He also was aware that any policy issued by the pool necessarily would cover all of ESA's employees in Massachusetts, whether or not they had been disclosed in the application. Nevertheless, he elected to reveal only a small number of ESA's client companies so that ESA could obtain a policy and continue to operate in Massachusetts, while keeping the premium low enough for ESA to remain profitable and maintain a positive cash flow.

On August 22, 1991, WCRIB accepted the fourth application, bound coverage, and assigned the policy to American Policy-

---

[3]Trapasso testified for the Commonwealth under a grant of immunity.

holders Insurance Company (API). An important factor in the decision to write the policy was the false DET report that seemingly corroborated the extent of ESA's payroll. Based upon the payroll and job classifications that ESA had listed in its application, WCRIB computed an initial premium for the policy of $770,468. Although this premium was subject to adjustment, after an end-of-year audit, to reflect payroll changes that developed during the year, WCRIB considered it important to use realistic payroll estimates at the inception of the policy in order to collect a proper initial premium.

After the policy went into effect, ESA maintained a list of disclosed and undisclosed clients. If a workers' compensation claim came in to ESA for an employee of a disclosed client, the claim would be forwarded to API; but if a claim came in for an employee of a client company that had not been revealed, the claim usually would be handled and adjusted internally by ESA, even though there was no legitimate basis for a Massachusetts employer to act as a partial (and unlicensed) self-insurer. Ultimately, however, this system did not prevent API from having to pay claims on behalf of undisclosed companies for two reasons. First, API received direct reports of injuries with some frequency. Second, as Trapasso testified, if a claim came in to ESA that presented a large exposure, the defendant would turn it over to API. When API was notified of claims that did not match up with the information provided in the original application and binder, ESA would cover its tracks by informing API that there had been a mistake or that something had changed since the time of application.

Claims from undisclosed client companies surfaced often enough that, eventually, API threatened to cancel the policy unless ESA immediately disclosed its entire list of client companies and supplied payroll records documenting the full extent of the exposure. At the end of March, 1992, the defendant complied, but as he prepared to do so, he told Trapasso that he knew this would result in a dramatic premium increase and that he had no intention of paying the entire bill. Thereafter, a list was provided to API, disclosing a total of 245 client companies, 164 of which had payroll with ESA that predated the inception of the policy. This resulted in a new estimated premium charge

of approximately $5.5 million, a substantial portion of which was attributable to the undisclosed, preinception clients.

Meanwhile, the defendant was engaged in a scheme to create and distribute false certificates of insurance that purported to document the existence of general liability and workers' compensation insurance coverage issued to ESA for the protection of the workers of its client companies. The defendant had ESA's computer technician develop a form certificate into which the defendant or others under his direction would insert the names of nonexistent producers (agents or brokers) and fictitious workers' compensation insurers. These documents were supplied, as proof of insurance, to client companies and their contractors. Some of the false certificates were created and distributed during the period that ESA had no workers' compensation coverage in place, that is, between April 1, 1991, when the National Union policy expired, and August 22, 1991, when the API policy took effect. Other false certificates were disseminated during the API policy period, as part of the defendant's efforts to control claims and conceal them from API. This was accomplished by listing ESA's street address in Connecticut as the address of the nonexistent producers, thus making it more likely that claims would make their way back to the defendant's attention.

Eventually, in June, 1992, ESA's API policy was canceled for nonpayment of premium. In the aftermath of the cancellation, API conducted an audit of ESA's payroll and issued a bill for a premium balance of $4,206,219.83. ESA disputed how this amount was calculated, contending that the wrong experience modification factor was applied. However, even using ESA's preferred factor, it would have owed approximately $2.7 million of additional premium for the 164 undisclosed client companies that were on its payroll at the inception of the policy. ESA did not pay any portion of the disputed premium balance.[4]

2. *The larceny conviction.* Conviction of larceny by false pretenses under G. L. c. 266, § 30, requires proof that (1) the defendant knowingly made a false statement of fact; (2) the defendant intended that the person to whom the false statement

---

[4]At the time of the defendant's criminal trial, the premium dispute remained the subject of civil litigation.

was made would rely on its truth; (3) such person did rely upon the false statement; and (4) the person parted with personal property based upon such reliance. See *Commonwealth* v. *Leonard*, 352 Mass. 636, 644-645 (1967); *Commonwealth* v. *Charles*, 428 Mass. 672, 683 n.8 (1999). These elements were met here, where the Commonwealth established that the defendant submitted an application for workers' compensation coverage, knowing that it contained false statements about the extent of ESA's payroll and the number of its client companies; that he intended that WCRIB and the assigned insurer, API, rely upon these falsehoods in issuing the coverage and determining the initial premium; that WCRIB and API did so rely; and that they parted with a valuable insurance policy and valuable services to support the policy, at a premium far lower than what WCRIB and API were entitled to receive.

The defendant's principal argument concerning his larceny conviction is that evidence of false statements was lacking, because the final application included the letter from Trapasso to Cantone. According to the defendant, this letter truthfully disclosed that not all of ESA's client companies were being identified and that ESA did not intend the insurer to cover those not disclosed. The judge was entitled to reject this interpretation, however, particularly in view of Trapasso's testimony that the letter was categorically untrue (no clients were seeking their own policies) and that the defendant knew full well that the pool policy would cover all of ESA's Massachusetts employees, whether or not they had been disclosed. Moreover, even apart from the Trapasso letter, the false statement element was met by proof of the defendant's submission of the false DET report to back up his understatement of ESA's payroll.

The defendant also claims that there was insufficient evidence of reliance by WCRIB or API upon any falsehoods in the application, and insufficient evidence of any loss of property based upon such reliance. The defendant points to the fact that the application was never intended to be used to determine the final premium; instead, it was always anticipated that the final premium would be calculated and billed based upon the actual payroll figures for the completed policy period. Of course, the final audit resulted in a multimillion dollar outstanding bill, a

good portion of which related to ESA's undisclosed preexisting clients. Nevertheless, the defendant maintains that WCRIB and API suffered no loss, because if the final premium had been properly calculated, and if ESA had been credited with the payments that it made directly to workers' compensation claimants, ESA would have owed nothing beyond what it already had paid.

Leaving to one side whether ESA eventually paid a fair, final premium for the policy, the evidence nevertheless established reliance by WCRIB and API and a resultant loss of property. Bowdridge specifically testified that he relied upon the representations in the application in both binding the coverage and in determining the initial premium. Thus, at a minimum, the defendant's false statements induced WCRIB and API to part with an insurance policy and associated services. See *Commonwealth* v. *Levin*, 11 Mass. App. Ct. 482, 496 (1981), *S.C.*, 390 Mass. 857 (1984) (under G. L. c. 266, § 30[2], insurance policy is "property" for purposes of larceny by false pretenses, because it is "valuable contract in force"). The false statements also deprived WCRIB and API of the timely use of money — i.e., the difference between the initial premium that was paid by ESA and one that was properly computed. See *Commonwealth* v. *Stovall*, 22 Mass. App. Ct. 737, 742-743 (1986) (larceny by false pretenses may be based upon obtaining temporary use of victim's money).

As for ESA's argument about the final premium, even if some portion of the premium balance was subject to legitimate dispute, it is evident from a restitution order entered by the judge that she did not accept the defendant's analysis that no further premium was owed. On the evidence presented, there was ample basis for the judge to find that, at the expiration of the policy, ESA still owed an additional premium to WCRIB and API for risks that the defendant had deliberately concealed; that this amount far exceeded the requisite $250, see G. L. c. 266, § 30; and that the loss of this premium resulted from WCRIB's and API's initial issuance of the policy at an unfairly low price, in reliance upon the defendant's false statements.

Little discussion is required of the defendant's final contention with respect to his larceny conviction — that he should be relieved of criminal liability because he rectified any falsehood

by responding in March, 1992, to API's demand for complete and accurate information. Suffice it to say that, although eventually he was forced to disclose the truth, he did so only after the damage was done. His eventual disclosure provided no defense to the crime.

3. *The uttering convictions.* The crime of uttering false instruments, G. L. c. 267, § 5, is proved by establishing that the defendant, with intent to injure or defraud, uttered and published as true a false, forged or altered record, deed, instrument or other writing mentioned in the Massachusetts forgery statutes, G. L. c. 267, §§ 1-4. See *Commonwealth* v. *Levin, supra* at 496-497. Here, the indictments recited, and the Commonwealth endeavored to prove, that each of the false certificates disseminated by the defendant constituted "a policy of insurance," as mentioned in G. L. c. 267, § 1.[5] This phrase has been construed to refer not only to the policy proper, but also to other documents which comprise an integral part of an insurance contract. See *id.* at 497-498 (affirming uttering convictions based upon submission of forged life insurance application that was incorporated into policy).

At issue is whether the false certificates of insurance provided by ESA to its client companies and their contractors can accurately be characterized as a policy of insurance or component thereof. The defendant argues that they cannot, and that the uttering convictions therefore cannot stand. With little elaboration, the Commonwealth responds that a certificate of insurance is an integral part of an insurance contract, as illustrated by *Kirkpatrick* v. *Boston Mut. Life Ins. Co.*, 393 Mass. 640 (1985). In *Kirkpatrick*, the Supreme Judicial Court considered the legal effect of a conflict between the effective date listed in an employee's group disability insurance certificate and that contained in the master policy issued to his employer. Because of special concerns relating to the marketing of group insurance policies through the workplace, the court held that, where group insurance certificates create ambiguities in the extent of coverage, and particularly where conflicts exist between the terms of the certificate and the group policy, the language of the

[5]The Commonwealth does not contend, and it does not readily appear, that any other category of document mentioned in the forgery statutes is applicable here.

certificate, where more favorable to the insured, will prevail. *Id.* at 647-648. In so doing, the court rejected the insurer's argument that enforcing a term in the certificate would create insurance coverage by estoppel — reasoning that the contract between the employee and the insurer consisted of both the certificate and the master policy. This approach was consistent with the prevailing view in other jurisdictions that, in the context of group insurance policies, a certificate or plan summary provided to an individual insured (often with the imprimatur of the insurer) confers rights upon the holder and is considered to be part of the insurance agreement. See generally 4 Holmes, Appleman on Insurance § 20.5 (2d ed. 1998).

The difficulty we have with the Commonwealth's reliance upon *Kirkpatrick* is that there are well-established legal distinctions between employee group insurance certificates and certificates of insurance that are utilized to evidence the existence of an enterprise's liability or workers' compensation coverage. In the latter context, a certificate of insurance is simply a form that is completed by an insurance broker or agent at the request of a policyholder to document the fact that an insurance policy has been written. See *Marlin* v. *Wetzel County Bd. of Educ.*, 569 S.E.2d 462, 470-471 (W. Va. 2002); Glucksman & Barger, Additional Insured Endorsements: Their Vital Importance in Construction Defect Litigation, 21 Construction Law. 30, 33 (Winter 2001). For example, because contractors are legally responsible for providing workers' compensation benefits to the employees of an uninsured subcontractor, see G. L. c. 152, § 18, contractors commonly require that their subcontractors provide them with certificates of insurance as proof that such coverage has been purchased. See Malecki, The Additional Insured Book 293 (4th ed. 2000). Confirmatory certificates of this sort typically contain disclaimer language to dispel any suggestion that they confer any rights upon the certificate holder, and they are widely considered *not* to be a part of the insurance contract. See, e.g., *G.E. Tignall & Co.* v. *Reliance Natl. Ins. Co.*, 102 F. Supp. 2d 300, 304 (D. Md. 2000); *Pekin Ins. Co.* v. *American Country Ins. Co.*, 213 Ill. App. 3d 543, 547-548 (1991); *Trapani* v. *10 Arial Way Assocs.*, 301 A.D.2d 644, 647 (N.Y. 2003); *Granite Constr. Co.* v.

*Bituminous Ins. Cos.*, 832 S.W.2d 427, 429 (Tex. Ct. App. 1992); *Postlewait Constr., Inc.* v. *Great Am. Ins. Cos.*, 106 Wash. 2d 96, 100-101 (1986).

The documents uttered by the defendant in this case were fabrications of this informational type of certificate, even insofar as they mimicked the typical disclaimer language. They did not purport to reflect individual contract rights under a master group policy or even additional insured status for the client companies under a policy issued to ESA. Rather, they were false representations of the existence of a policy which ESA claimed to have obtained for the protection of the workers that it employed and leased back to the client companies.

In view of the type of certificate of insurance that was falsified and uttered in this case, we think it unclear, at best, that such a document falls within the ambit of "a policy of insurance" as mentioned in G. L. c. 267, § 1. Cf. *Robert McMullan & Son, Inc.* v. *United States Fid. & Guar. Co.*, 103 Cal. App. 3d 198, 203 (1980) (certificate of insurance issued by insured's broker to verify existence of policy was not within Florida statute's definition of insurance policy).[6] Mindful of the precepts that criminal statutes are strictly construed against the Commonwealth, and that any plausible ambiguity must be resolved in favor of the defendant, see, e.g., *Youngworth* v. *Commonwealth*, 436 Mass. 608, 611 (2002); *Commonwealth* v. *Hill*, 57 Mass. App. Ct. 240, 249 (2003), we are constrained to conclude that although the defendant's deception in disseminating these documents may have lent itself to other grounds of prosecution, the Commonwealth did not present a sustainable theory for the defendant's "uttering" convictions.[7]

4. *Disposition.* The judgment on the indictment charging the defendant with larceny from WCRIB and API is affirmed. The

---

[6]Our doubts on this score are compounded by the fact that in some other statutes, our Legislature has seen fit to mention both insurance policies and certificates of insurance, as if to acknowledge that they are discrete types of documents. See G. L. c. 7, § 38H(*f*); G. L. c. 175, § 2B(2); G. L. c. 175, § 162F. Cf. *Hallett* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 66, 69 (2000) (where language is employed in one part of statute but not in others on same topic, language should not be implied where it is not present).

[7]In view of our conclusion, we need not consider the defendant's other arguments with respect to the uttering convictions.

judgments on the uttering indictments, under G. L. c. 267, § 5, are reversed, the findings are set aside, and judgments are to enter for the defendant.

*So ordered.*