## COMMONWEALTH *VS.* JOHN D. MURPHY.

No. 01-P-592.

Middlesex. October 17, 2002. - October 15, 2003.

Present: GELINAS, DOERFER, & GREEN, JJ.

*Forgery. Larceny. Uttering Forged Instrument. Fraudulent Use of Credit Card. Evidence,* Handwriting exemplar, Expert opinion. *Witness,* Expert. *Statute,* Construction. *Practice, Criminal,* Jury and jurors, Grand jury proceedings.

At a criminal trial, the judge did not err in denying the defendant's motion to strike handwriting exemplars used by an expert witness, where the Commonwealth produced ample evidence to support the conclusion that the defendant had signed each exemplar. [573-574]

The judge at a criminal trial did not create a substantial risk of a miscarriage of justice by declining to strike, as lacking in scientific reliability, a handwriting expert's testimony as to conclusions she had reached with respect to the authorship of certain signatures, where the determination of the admissibility of such testimony was a matter best left to the discretion of the trial judge, and where, in the circumstances, a preliminary hearing pursuant to *Commonwealth* v. *Lanigan,* 419 Mass. 15, 24-27 (1994), concerning the scientific reliability of such testimony, was not required. [574-576]

This court concluded that a bank signature card constituted "evidence or muniment of title to property" (i.e., a bank account) within the meaning of G. L. c. 267, § 1, and thus was a document capable of being forged and uttered within the meaning of G. L. c. 267, §§ 1 and 5. [576-578]

Evidence presented at a criminal trial was sufficient to permit the jury to infer the existence of the elements of the crimes of larceny over $250, forgery, and uttering. [578-579]

At a criminal trial, the judge did not err or abuse her discretion by declining to declare a mistrial after a juror disclosed that he was a close friend of, and had engaged in discussion with, an attorney, not the trial attorney, who had represented the defendant in a different pending criminal matter, where the judge's appropriate hearing, coupled with her detailed findings, demonstrated that the contact did not result in any actual prejudice to the defendant. [579-581]

A criminal defendant failed to demonstrate that a grand jury issued indictments against him based on misleading and insufficient evidence. [581-582]

INDICTMENTS found and returned in the Superior Court Department on April 23, 1998.

The cases were tried before *Sandra L. Hamlin*, J.

*Angela G. Lehman* for the defendant.

*Sheryl F. Grant*, Assistant District Attorney, for the Commonwealth.

GELINAS, J. The defendant, John D. Murphy, was indicted in Middlesex Superior Court on fourteen counts of larceny over $250 (G. L. c. 266, § 30), and one count each of fraudulent use of a credit card to obtain money or goods (G. L. c. 266, § 37C); forgery of a record-return or writing (G. L. c. 267, § 1); uttering (G. L. c. 267, § 5); and falsifying or stealing a driver's license (G. L. c. 90, § 24B). Two counts of larceny over $250 subsequently were dismissed by the Commonwealth. After trial, a jury returned verdicts of guilty on the remaining sixteen counts. Murphy appeals from the convictions,[1] claiming (1) error in the trial court's refusal to strike the conclusions of a handwriting expert, and to limit the use by the expert of certain standards of comparison; (2) that the trial judge committed reversible error in arbitrarily finding that a bank signature card was a legal document within the meaning of G. L. c. 267, § 1; (3) that there was insufficient evidence to support convictions of larceny over $250, forgery, and uttering; (4) that the trial court committed reversible error in failing to declare a mistrial after discovering that a juror was a close friend of, and had engaged in discussion with, an attorney, not the trial attorney, who represented Murphy in a different pending criminal matter; and (5) that certain indictments should have been dismissed, as the Commonwealth had presented misleading and insufficient evidence to the grand jury. We affirm.

We summarize the facts, adding detail as necessary to a discussion of the issues. Between January 31, 1997, and July 3, 1998, the identities of six different people were stolen.[2] Through use of these identities, televisions, video cassette recorders,

---

[1] The defendant's conviction for falsifying or stealing a driver's license was placed on file without objection and is not here at issue.

[2] Identity theft occurs when someone appropriates a person's personal information without that person's knowledge to commit fraud or theft. It is accomplished by coopting a person's name, social security number, credit card number, or some other piece of personal information for illicit use. See generally http://www.consumer.gov/idtheft, an Internet Web site maintained by the Federal Trade Commission.

furniture, and computers, to the value of at least $17,000, were obtained from different vendors, including several stores operated by Sears and Circuit City. In addition, the stolen identities were used to open bank accounts and accounts at Mailboxes, Etc. It is undisputed that the six people whose identities were used, all named either John Murphy or Michael Sullivan, did not purchase the goods or open the accounts in question.

As a result of investigation, the defendant was arrested. In the course of the arrest, the police recovered, from a vehicle he had rented and in which he was seated at the time of arrest, various credit cards, receipts, checks, invoices, bank receipts, other commercial documents, and three birth certificates. We review each of the defendant's claimed errors in turn.

*Handwriting analysis.* At trial, the Commonwealth called Nancy McCann as a witness. After hearing testimony concerning her credentials, the judge allowed her to testify as a handwriting expert. The defendant timely moved to strike a number of exhibits she had used as standards of comparison for the defendant's signature.[3] These included seven letters sent to the clerk of the Middlesex Superior Court, all relating to the case pending against the defendant and signed "John Murphy," and eight documents bearing the signature "Michael Sullivan," found in the car the defendant had rented and was operating at the time of his arrest. The defendant claims that, without testimony by persons who saw him sign each exemplar used as a standard of comparison, the documents should not have been admitted, or, in the alternative, the trial judge should have given a limiting instruction. Murphy contends that failure either to strike or give the instruction impermissibly shifted the burden of proof.

To have them admitted, the Commonwealth was required to show by a preponderance of the evidence that the defendant signed the exemplars. See *Commonwealth* v. *Polian,* 288 Mass. 494, 499 (1934). It was for the trial judge to determine whether

---

[3]The defendant made no objection regarding the use of the defendant's signature from (1) the Miranda card and the booking sheet he signed when arrested; (2) a redacted bail recognizance form and a redacted affidavit of indigency form he signed at arraignment; (3) a "Michael Sullivan" signature from a bank signature card; and (4) a "Michael Sullivan" signature from a license that the defendant had procured. All were used as standards of comparison.

the Commonwealth satisfied its burden. There was here ample evidence to support the trial judge's preliminary finding to that effect. As to the letters, they were addressed to the court clerk. They requested information about the defendant's case, included the case docket number, and bore the signature "John Murphy." As to the "Michael Sullivan" signatures, they were affixed to documents found in the rented car being driven by the defendant at the time of his arrest. In addition, two of those documents bore the defendant's picture next to the "Michael Sullivan" signature, and there was evidence from a bank employee that the defendant had produced a license showing that he was "Michael Sullivan" when he signed another of the documents.

It is not obvious to us, and the defendant proposes no intelligible basis to believe, that the judge's well-supported preliminary evidentiary determination somehow shifted an impermissible burden onto the defendant or otherwise prejudiced him in any way. The judge's preliminary findings were not communicated to the jury. Neither did admitting the exemplars create any presumption or compel any conclusion. Instead, the judge left it to the jury to draw their own fair inferences. There was no error.

The defendant next argues that the judge erred in failing to strike McCann's testimony as to certain conclusions she reached with respect to the authorship of the questioned signatures.[4] No objection or motion to strike was taken at the time McCann initially testified; the defendant did not move to strike the testimony until the following day, after lengthy cross-examination. The objections and motions to strike were not timely. See *Commonwealth* v. *Silvia*, 343 Mass. 130, 135-136, (1961) (objections "must be taken to evidence when it is offered"); *Commonwealth* v. *Wood*, 17 Mass. App. Ct. 304, 307 (1983); *Commonwealth* v. *Pagano*, 47 Mass. App. Ct. 55, 59 (1999), cert. denied, 528 U.S. 1084 (2000). We review only to determine whether an error occurred that created a substantial

---

[4]The testimony included statements that "it is highly probable that all of the questioned John Murphy and M. Sullivan signatures appearing on the various charge slips . . . were written by the same individual," and that "it is more probable than not that all of the questioned signatures were written by the same person who authored the numerous John Murphys and Michael Sullivan signatures."

risk of a miscarriage of justice. See *Commonwealth* v. *Epsom,* 399 Mass. 254, 259-260 (1987).

Citing to *United States* v. *Hines,* 55 F. Supp. 2d 62 (D. Mass. 1999), the defendant argued at trial, and argues again on appeal, that conclusions by a handwriting expert should not be considered because of weaknesses in their scientific reliability.[5] The defendant, however, never requested a *Lanigan* hearing, see *Commonwealth* v. *Lanigan,* 419 Mass. 15, 24-27 (1994), to determine whether McCann could testify as to her conclusions regarding the handwriting exemplars. Had he wanted to challenge the scientific reliability of McCann's testimony, he should have filed a motion for a hearing prior to the introduction of the evidence. See *Commonwealth* v. *Sparks,* 433 Mass. 654, 659 (2001) (to preserve an objection based on scientific unreliability, defendant must file an appropriate pretrial motion stating the grounds for the objections, and must request a hearing in accordance with the principles set forth in *Canavan's Case,* 432 Mass. 304, 309-312 [2000], and *Commonwealth* v. *Lanigan, supra*). Because the defendant did not object until after McCann had testified, there was no voir dire hearing regarding the scientific reliability of McCann's testimony. See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993).

Unlike the case in *Sparks,* the defendant here did raise the issue after McCann testified, and again after extensive cross-examination. We consider whether the argument has merit, and whether the trial judge abused her discretion or committed error of law resulting in a substantial risk of a miscarriage of justice.

---

[5]In *Hines,* the defendant moved prior to trial, in accordance with *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co.* v. *Carmichael,* 526 U.S. 137 (1999), to exclude the entire testimony of the government's handwriting expert on grounds that such evidence was not scientifically reliable. Applying the four principles laid out in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc., supra* at 592-595 (i.e., [1] whether the expert's technique can be or has been tested; [2] whether the method has been subjected to peer review and publication; [3] the known or potential rate of error of the technique; and [4] whether there is "general acceptance" of the technique within the relevant scientific community, to the extent that one exists), the trial judge admitted the expert's testimony concerning similarities and dissimilarities between known exemplars of the defendant's handwriting and a note used in an armed robbery, and that the writings were consistent with each other, but declined to permit the expert to give any ultimate conclusions as to authorship.

See and compare *Canavan's Case, supra* at 312. We conclude that the testimony of a handwriting expert about who wrote or signed a document is of that variety of "soft science" that is highly dependent on information derived from such sources as personal observations, clinical assessments, and statistical data, and as such we defer especially to the judge's exercise of discretion. *Id.* at 318.

Additionally, the opinion of a handwriting expert as to the probability of authorship has a long history of acceptance in our jurisprudence. See, e.g., *Commonwealth* v. *Buckley*, 410 Mass. 209, 213-214 (1991) (two handwriting experts testified that handwriting "matched" and defendant "probably" wrote the document, while third testified that there was the "highest probability" that the defendant wrote the document); *Commonwealth* v. *Romero*, 25 Mass. App. Ct. 51, 52 (1987) (evidence jury could consider included testimony of handwriting expert that "a great many names" appeared to have been written by the same person); *Commonwealth* v. *Lima*, 29 Mass. App. Ct. 490, 497 (1990) (handwriting expert opined that, based on court documents, the defendant signed an auto rental agreement). We conclude that, as the courts in Massachusetts have long accepted as reliable expert testimony about the authorship of handwriting, a *Lanigan* hearing was not necessary even had one properly been requested. See *Commonwealth* v. *Frangipane*, 433 Mass. 527, 538 (2001) (*Lanigan* hearing not necessary where qualified expert testimony has been accepted as reliable in the past in Massachusetts appellate cases).[6] There was no abuse of discretion or error of law in admitting the challenged testimony.

*Bank signature card.* The defendant next argues that the trial judge erred as matter of law when she ruled that the bank signature card he used to open a fictitious checking account was a document capable of being forged and uttered under G. L.

---

[6]We see nothing in *Frangipane* that would preclude a party from requesting a *Lanigan* hearing should science in the particular field advance to a point where expert testimony, generally accepted as reliable in the past, would no longer be so considered. The defendant here makes no such claim; he contends only that the principles explained in *Daubert* and *Lanigan* now affect testimony by experts in the field of handwriting analysis.

c. 267, §§ 1, 5.[7] He argues that, as the statute contains no specific reference to a bank signature card, he cannot be convicted under its terms. That view of the statute would permit a person, with intent to defraud, to sign signature cards and open accounts in other people's names and face no penalty for doing so. See *Commonwealth* v. *Dale D.*, 431 Mass. 757, 760 (2000). We conclude, rather, that a bank signature card constitutes "evidence or muniment of title to property" and, thus, is a document capable of being forged and altered under the statute.

As a general rule, "a statute [must be interpreted] in accord with 'the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated, *Telesetsky* v. *Wright*, 395 Mass. 868, 872-873 (1985), . . . and to avoid imputing a '[b]arrenness of accomplishment,' *Plymouth County Retirement Ass'n.* v. *Commissioner of Pub. Employee Retirement*, 410 Mass. 307, 312 (1991)." *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996). While the words "evidence or muniment of title" appear directly after a specific type of document, a stock certificate, we read the words in question in the disjunctive, as the word "or" appears after the words describing several specific types of documents. See *Commonwealth* v. *Davie*, 46 Mass. App. Ct. 25, 27 (1998). The use of the disjunctive "or" serves to distinguish between the types of documents

---

[7]General Laws c. 267, § 1, as amended through St. 1986, c. 557, § 190, provides, in relevant part: "Whoever, with intent to injure or defraud, falsely makes, alters, forges or counterfeits . . . an accountable receipt for money, goods or other property; or a stock certificate, *or any evidence or muniment of title to property*; . . . shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years" (emphasis supplied).

General Laws c. 267, § 5, provides: "Whoever, with intent to injure or defraud, utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in the four preceding sections, knowing the same to be false, forged or altered, shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years."

contemplated. The clause can easily be understood to read that any document that is either evidence of title to property, or a muniment[8] of title to property, may be the subject of forgery and uttering under the statute. The phrase "evidence of title" may refer to either personal or real property. Compare *Greeley* v. *Flynn*, 310 Mass. 23, 26 (1941) (gift of bank book, which was evidence of title, was shown by delivery of the book); and *Long* v. *Wickett*, 50 Mass. App. Ct. 380, 382 n.3 (2000). We think the same principle is applicable to a muniment of title to property. There was testimony at trial that the bank signature card was evidence of title to the bank account. Certainly, a signature card would constitute evidence by which one could defend title to a bank account. A bank signature card is evidence of ownership of the account. See *Doran* v. *Nally*, 10 Mass. App. Ct. 893 (1980). Under the plain language of the statute, the Legislature intended to punish those who forged documents with the intent to injure or defraud, see G. L. c. 267, § 1. We are mindful that criminal statutes must be strictly construed against the government, that is, a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited. See *Commonwealth* v. *George*, 430 Mass. 276, 278 (1999). In abiding by the strict construction rule, however, the Commonwealth is permitted an "available and sensible interpretation," *Commonwealth* v. *Wotan*, 422 Mass. 740, 743 (1996), quoting from *Commonwealth* v. *Roucoulet*, 413 Mass. 647, 652 (1992), as we think obtains here. We conclude that the judge properly found that the bank signature card was a document both capable of being forged under G. L. c. 267, § 1, and uttered under G. L. c. 267, § 5. Compare *Commonwealth* v. *Gall*, 58 Mass. App. Ct. 278, 288-290 (2003) (certificate of insurance not evidence of muniment of title).

*Sufficiency of the evidence.* Deciding, as we do, that the trial judge properly admitted both the handwriting expert's opinions and the bank signature card, it necessarily follows that the

---

[8]Black's Law Dictionary 1038 (7th ed. 1999) defines "muniment" as a "document (such as a deed or charter) evidencing the rights or privileges of a person, family, or corporation." Webster's Third New International Dictionary 1487 (3d ed. 1993) defines "muniment" as documentary evidence by which one can defend a title to property or a claim to rights.

evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to permit the jury to infer the existence of the essential elements of larceny over $250, forgery and uttering. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). The judge did not err in denying the defendant's motions for required findings.

*Juror issue.* During jury selection process, one of the jurors indicated that his father-in-law was a former United States attorney, and that his cousin was a police officer. On the fifth day of trial, this same juror informed the court that, while the trial was ongoing, he spoke with an individual at a social gathering and learned that the defendant had other criminal matters pending in Suffolk Superior Court. At a hearing on the matter, the juror informed the judge that "somebody let out that they knew that the defendant had another criminal proceeding before the [c]ourt."[9] The juror said that he had not spoken to any of the other jurors about the matter, and assured the judge that he could remain fair and impartial.[10] Based upon these representations, the defendant and his trial counsel did not move to dismiss the juror or seek a mistrial. The judge found the juror to be credible when he said that he had not talked to any of the other jurors about the matter, found that the juror remained fair and impartial, and permitted him to remain on the jury.

That evening, the defendant called Robert Fox, his trial counsel in the other case. The following day, the defendant reported to the court that Fox told him he (Fox) had run across the juror and related that Fox was the defendant's criminal attorney on the unrelated matters. The trial court ordered Fox to appear in court and then conducted a further hearing. In response to the judge's questions, Fox indicated that the juror was one of his best friends. Fox further advised the judge that prior to this

---

[9]When asked to relate the specifics of the conversation, the juror stated that the other person, after finding out the name of the trial judge, stated, "Oh, that's the John Murphy case. He's got another one too."

[10]At the hearing, when asked if he could remain fair and impartial, the juror stated: "Absolutely. I think it is completely irrelevant to this matter at hand. And in this country, you're innocent until proven guilty. And it is completely irrelevant as far as I'm concerned. And I only mentioned it because I thought the defendant was entitled to have, you know, the best, fairest hearing possible, which is why I wanted to bring it up to everybody's attention. It has no impact on me whatsoever."

trial, he and the juror had had many discussions about his criminal defense work and the judicial system. Upon this information, the defendant's trial counsel moved for a mistrial and objected to the juror's continued participation in the trial. The trial judge made further findings as to the credibility of Fox and the juror, renewed her finding that the juror remained impartial and unbiased, denied the motion for a mistrial, and permitted the juror to remain.

The defendant argues that a high probability of prejudice exists because this juror (who had relatives in law enforcement) acquired knowledge of Murphy's open criminal matters, and that this high probability of prejudice required the trial judge either to declare a mistrial or, at least, to remove the juror from the panel. See *State ex rel. Owen* v. *McMann*, 435 F.2d 813, 818 (2d Cir. 1970), cert. denied, 402 U.S. 906 (1971). The defendant admits that there is no evidence of any communication with other jurors, and our review of the record finds no direct evidence of bias or partiality. Nonetheless, we recognize, as the defendant argues, that "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury, is, for obvious reasons, deemed presumptively prejudicial." *Remmer* v. *United States*, 347 U.S. 227, 229 (1954).

In *Remmer*, the defendant, charged with income tax evasion, learned that in the course of the trial someone suggested to a juror that the juror could profit by bringing in a verdict favorable to the defendant. After investigation, the prosecutor and the trial judge determined that the remark had been made in jest and could therefore be ignored. Contrarily, the Supreme Court held that, under the circumstances, the remark had to be deemed presumptively prejudicial to the defendant and that he was entitled to a hearing to determine if, in fact, he had been prejudiced by the contact. *Id.* at 229-230. Here, by contrast, the trial judge conducted an appropriate hearing, taking the additional step of requiring the defendant's other attorney to appear and testify. After hearing, the trial judge determined that both the juror and Fox were credible, and that the juror remained impartial and unbiased.

"The constitutional standard of fairness requires only that the

jurors be impartial and indifferent." *Commonwealth* v. *Daughtry*, 417 Mass. 136, 147 (1994), quoting from *Commonwealth* v. *Jackson*, 376 Mass. 790, 799 (1978). "Juror bias is a question of fact to be determined by the judge. A finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that the finding was clearly erroneous." *Commonwealth* v. *Emerson*, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000). In part, a judge's determination of impartiality rests on her determination of the credibility of those testifying. "The determination of a juror's impartiality 'is essentially one of credibility, and therefore largely one of demeanor' . . . . In such circumstances, we give a trial judge's determination of impartiality great deference." *Commonwealth* v. *Ferguson*, 425 Mass. 349, 352-353 (1997), quoting from *Patton* v. *Yount*, 467 U.S. 1025, 1038 (1984). As well, the mere fact that a juror knows a police officer or prosecutor, or is related to them, does not disqualify a juror from service or show any bias. See *Commonwealth* v. *Duran*, 435 Mass. 97, 106-107 (2001) (fact that juror was a correctional officer where the defendant held did not create a presumption of bias). The trial court's finding here was not clearly erroneous, nor was there an abuse of discretion. Even though the contact may have given rise to a high probability of prejudice, the trial judge's appropriate hearing, coupled with her detailed findings, satisfies us that, as the trial judge found, this probability did not manifest in any actual prejudice.

*The indictments.* The defendant's final contention, that the grand jury improperly issued indictments charging the defendant with larceny over $250 and fraudulent use of a credit card, is without merit. Our review of the record suggests that the evidence provided by Sergeant DiDomenica, the Commonwealth's sole witness, was sufficient to identify the defendant as the person involved in each crime, and to justify a reasonable person's conclusion that the defendant used the accounts to buy items and that he intended to do so. The receipts offered reflect that he obtained the goods listed in them. We generally will not review the sufficiency or competency of the evidence before a grand jury. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 384 (1989). We have, rarely, departed from the rule where there

was insufficient evidence to establish the identity of the accused or probable cause to arrest him, or where the integrity of the grand jury process was impaired. See *ibid.*; *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 616 (1990), *S.C.*, 410 Mass. 1005 (1991). To invoke these rare exceptions, the defendant bears the burden of showing that the evidence presented (1) was given with knowledge that it was false and deceptive; (2) was given with the intention of obtaining an indictment; and (3) must probably have influenced the grand jury's determination to hand up an indictment. *Commonwealth* v. *Pond*, 24 Mass. App. Ct. 546, 551 (1987). We conclude that the defendant has failed to show the existence of any of these elements.

*Judgments affirmed.*