## COMMONWEALTH *vs.* FREDERIC LEPPER.

No. 01-P-723.

Worcester. May 9, 2003. - November 19, 2003.

Present: DUFFLY, CYPHER, & COHEN, JJ.

*Larceny. False Pretenses. License. Joint Enterprise. Evidence,* Joint venturer. *Practice, Criminal,* Instructions to jury, Sentence, Assistance of counsel, Argument by prosecutor.

The evidence at a criminal trial was sufficient to convict the defendant of larceny by false pretenses arising out of a scheme involving the erection of metal storage structures, where, with respect to three of the indictments, the evidence warranted a finding that the defendant had engaged for several months in schemes to defraud individual customers and then had employed an accomplice to assist him in those endeavors, and that the defendant made false statements or caused his accomplice to make statements to customers that the defendant knew were false, with the intent that those statements would induce customers to sign contracts and pay deposits to the defendant, and that the customers were so induced [40-42]; where, with respect to six other indictments, the evidence was sufficient to convict the defendant as a joint venturer with his accomplice, who himself had formed the intent to defraud customers [42-44]; where, with respect to another indictment, there was evidence of false statements made to the customer, despite the fact that the customer did not testify, and direct proof that the customer's structure was never put up [44-45]; and where, with respect to yet another indictment, the defendant's claim that he had partially performed the contract did not negate any element of the crime of larceny by false pretenses and was not a defense [45].

At the trial of indictments charging the defendant with operating as an unlicensed home improvement contractor in violation of G. L. c. 142A, § 19, the evidence was sufficient to establish that the defendant was engaged in residential contracting so as to fall within the purview of c. 142A, where the structures the defendant promised to build and install were to be adjacent to owner-occupied buildings. [45-46]

Evidence at the trial of indictments charging the defendant with larceny by false pretenses and with operating as an unlicensed home improvement contractor *in violation of G. L. c. 142A, § 19, warranted the judge's instruction to the jury on joint venture, in that the evidence established both the criminal intent of the defendant's accomplice to commit the crime of larceny and that he and the defendant were operating in concert; further, the judge's instruction on joint venture properly gave the jury the guidance they needed to determine the issue. [46-47]

At the trial of indictments charging the defendant with larceny by false pretenses, the judge's adjudication of the defendant as a common and notorious thief pursuant to G. L. c. 266, § 40, did not remove from the jury the assessment of facts that increased the prescribed range of penalties to which the defendant was exposed, where, in order to convict on the twenty-three indictments charging larceny by false pretenses from twenty-three separate individuals on different dates, the jury were required to determine the facts with respect to each indictment beyond a reasonable doubt, and where the defendant's sentencing did not expose him to an enhanced sentence as a consequence of being adjudicated a common and notorious thief. [47-49]

Trial counsel for a criminal defendant was not ineffective for failing to object to a joint venture instruction, in not moving to strike a certain witness's testimony, in requesting that the defendant be adjudicated a common and notorious thief, or in failing to object to the prosecutor's closing, where there was no error in the instructions, where the court had jurisdiction over the charge involving the witness, and where the adjudication as a common and notorious thief was proper, and counsel's objections on these points would therefore have been unavailing; and where counsel's presentation of the defendant's case did not prejudice the defendant in any material matter. [49-50]

At a criminal trial, remarks made in the prosecutor's closing argument did not require reversal, where one reference to a victim as "pregnant" was not made to appeal to jurors' emotions, but was an attempt to distinguish her from the many other witnesses who appeared before the jury; where one of two references to "the type of person" the defendant was did not amount to an attack on the defendant's character, and where the other, an argument that a letter sent by the defendant to a victim was intended "to intimidate and bully and cajole" the victim into being afraid of the defendant, while better left unsaid, did not taint the jury's verdict; and where remarks possibly suggesting a shifting of the burden of proof and that it was the jurors' duty to convict, even assuming they were improperly suggestive, were cured by the judge's proper instructions. [50-53]

At a criminal trial, the judge did not abuse his discretion in denying the defendant's request for new counsel, where the judge gave the defendant an opportunity to articulate the reasons for his dissatisfaction before deciding that trial counsel was doing a satisfactory job and would not be removed. [53-54]

INDICTMENTS found and returned in the Superior Court Department on June 12, 1998.

The cases were tried before *James P. Donohue*, J., and a motion for a new trial, filed on November 20, 2001, was heard by him.

*Alan D. Campbell* for the defendant.

*Annette C. Benedetto*, Assistant Attorney General, for the Commonwealth.

DUFFLY, J. The failure to erect metal storage structures for twenty-three customers, after taking a hefty deposit from each customer and promising to commence construction by a specific date, resulted in the defendant's conviction by a jury on twenty-three indictments of larceny by false pretenses, G. L. c. 266, § 30, and four indictments of operating as a home contractor without a certificate of registration, G. L. c. 142A, § 19. The trial judge adjudicated the defendant a common and notorious thief under G. L. c. 266, § 40, and sentenced him to ten to fifteen years in prison on the underlying larceny convictions. A one-year sentence on the G. L. c. 142A, § 19, convictions was to be served concurrently.

The defendant appeals from the judgments and from the denial of his motion for a new trial. His primary claims are that (1) eleven of the larceny indictments and three of the indictments under G. L. c. 142A, § 19, lacked sufficient evidence to convict him; (2) the trial judge erred in giving a joint venture instruction; (3) the question whether the defendant was a common and notorious thief should have been the subject of a separate indictment for the jury to decide; (4) the defendant did not receive effective assistance from his trial counsel; and (5) the prosecutor engaged in improper closing argument. We affirm.

I. *Background.* We sketch the facts the jury could have found. From November, 1996, until November, 1997, the defendant owned Laredo Building Systems, a company that built and installed large metal storage sheds and barns. Prospective customers learned of the defendant's business through advertisements in local publications directing them to call a toll-free "800" telephone number where they would leave information in response to a recorded message. Their calls were returned within a few days, either by the defendant or, beginning in August, 1997, by his associate Charles Hill, who was hired by the defendant to sell the structures on a commission basis.[1]

A meeting was then scheduled with the customer where, typically, a contract was signed setting forth a start date for construction. The contract required payment of a deposit of

---

[1] Hill testified pursuant to a cooperation agreement with the Commonwealth. In exchange for his testimony against the defendant and upon his payment of restitution, Hill was to receive a sentence of probation.

one-third the total cost of building the structure, with another one-third to be paid upon delivery of the materials to the site, and the final one-third to be paid upon completion of the work.

Beginning in February, 1997, the defendant made misrepresentations to numerous prospective customers intending to induce them to part with their funds, which he succeeded in doing. Each interaction had unique aspects, but patterns emerge: the contracts set forth a specific start date for construction that could not have been met, and false assurances were given customers that work would commence at or near the contract date and that their structure would be completed two weeks after that.

In the case of the twenty-three customers whose transactions with the defendant formed the bases of the indictments against him, construction did not commence by the agreed-upon start date and, in most instances, did not commence at all. Despite numerous telephone calls to the defendant or Hill inquiring about the status of the project, none of the twenty-three customers ever received a refund of their deposits. The defense, presented largely through testimony of the defendant's wife, was that the defendant was an inept businessman who did not intend to defraud his customers.

II. *Discussion.* We discuss the defendant's nonfrivolous claims in the order that best avoids repetition of the evidence, providing additional factual detail within our discussion of the individual claims. "The [claims] not specifically discussed have either been subsumed in the discussion of other points or are so devoid of merit as not to warrant attention." *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. 241, 266 (1978).

1. *Sufficiency of the evidence.* The defendant argues that the evidence as to some but not all of the larceny indictments and G. L. c. 142A indictments was insufficient to convict and, thus, that the trial judge erred in denying his motion for a required finding of not guilty on those indictments. We review the denial to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). *Commonwealth* v. *O'Connell*, 438 Mass. 658, 661

(2003). We discuss the sufficiency of evidence claims, first as to the larceny indictments, followed by the G. L. c. 142A, § 19, indictments.

a. *Larceny by false pretenses.* "To constitute the crime of larceny by false pretenses . . . it must appear that [1] there was a false statement of fact known or believed by the defendant to be false [2] made with the intent that the person to whom it was made should rely upon its truth and [3] that such person relied upon it as true and [4] parted with personal property as a result of such reliance." *Commonwealth* v. *Iannello,* 344 Mass. 723, 734 (1962), quoting from *Commonwealth* v. *Louis Constr. Co.,* 343 Mass. 600, 604 (1962). See *Commonwealth* v. *Gall,* 58 Mass. App. Ct. 278, 285-286 (2003).

The defendant claims that the evidence was insufficient to support convictions involving eleven of the twenty-three victims, several of whom, he insists, spoke only with Hill and thus could not have formed a basis for convicting him absent evidence that he and Hill were joint venturers. He also argues that evidence of Hill's intent to defraud the victims was lacking and, thus, that there could be no joint venture.

*Indictments involving Lamprey, Roussey, and Black.* With respect to three of the victims (customers Daniel Lamprey, Donald Roussey, and Kyle Black), the evidence was sufficient to convict the defendant based either on his own false statements to those individuals or on false statements he caused Hill to make.

The defendant and Hill had met in 1995 when both were employed at the same automobile dealership. After Hill moved to Minnesota the defendant contacted him to see whether he might be interested in working for him as a salesman of the structures. In July, 1997, Hill returned to Massachusetts, and in early August, he agreed to work for the defendant. Hill would be paid a ten percent commission for each sale, payment to come out of the customer's initial deposit. The defendant told Hill he had already sold ninety structures but did not say how many had actually been built. Hill initially accompanied the defendant on meetings with prospective customers so that Hill could learn "how to present it." According to Hill, "[The

defendant] basically told me to listen to him and what he said so that when I went alone I would know what to say."

Hill and the defendant together met with Donald Lamprey in mid-August, 1997, but Lamprey spoke only with the defendant at that meeting. Lamprey wanted to see a structure that was built by the defendant before signing an agreement. The defendant suggested that he look at a partially constructed building in Sturbridge but told Lamprey not to communicate directly with the owners of that building. He told Lamprey that he "was putting up steel buildings all over the east coast and as far as out to Chicago." The defendant also told Lamprey that he had a quota to meet for metal supplies and that if Lamprey signed a contract by August 29, 1997, he could get him a better deal. Hill then brought Lamprey the contract that included a start date of September 29, 1997, and Lamprey paid a deposit of $2,625. Work on his structure was never commenced. This evidence was sufficient to convict the defendant on the Lamprey indictment based on statements he alone made to Lamprey as well as statements he directed Hill to make.

Donald Roussey first spoke with the defendant in June, 1997. Later, Hill brought Roussey a contract that set forth an October 5, 1997, start date, and Roussey paid Hill a $3,846 deposit. When no materials were delivered by October 5, Roussey called the defendant who gave various excuses — things were not going well, it had rained, he was doing a building in Brimfield, Roussey's building would be next — but no work ever commenced.

Hill met alone with Kyle Black on September 5, 1997, and subsequently gave Black a contract with a November 15, 1997, start date. Hill told Black that the building would go up in a matter of days. Black paid a $2,272 deposit. A short while later, Black received a note with the defendant's initials stating that the gable ends of the shed Black had ordered could not be provided because no kit was available. When Black spoke by telephone with the defendant and insisted on the gable ends, the defendant told him that he would be able to build them after all with no resulting delays. Black never received the promised structure.

Taken in the light most favorable to the Commonwealth, the

evidence was enough to satisfy any rational trier of fact beyond a reasonable doubt that each element of the crime was established. The evidence warranted the jury finding that the defendant, since February, 1997, had engaged in schemes to defraud individual customers and then had employed Hill in August, 1997, to assist him in those endeavors. The defendant caused Hill to tell customers, including Black and Roussey, that the buildings they had ordered would be started and thereafter completed in time to meet their needs. These statements by Hill were false.[2]

From this evidence, a fact finder could reasonably infer that the defendant knew Hill's statements to Roussey and Black were false and that he intended the false statements by Hill, as well as his own false statements to Lamprey, to induce those individuals to sign contracts and pay deposits that would be delivered to him, and that Lamprey, Roussey, and Black were each so induced. See and compare *Commonwealth* v. *Kenneally*, 10 Mass. App. Ct. 162, 165, 168-170 (1980), *S.C.*, 383 Mass. 269, cert. denied, 454 U.S. 849 (1981) (evidence sufficient to establish the defendant's guilt of larceny by false pretenses, where the defendant employed a salesman who sold policies of insurance to various individuals and obtained from them checks for insurance premiums which he delivered to the defendant who retained all or a portion of the checks and then failed to submit applications for the policies or altered the applications by reducing the premium amounts). See also *Commonwealth* v. *Kiernan*, 348 Mass. 29, 46-47 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts*, 380 U.S. 913 (1965); *Commonwealth* v. *Leonard*, 352 Mass. 636, 637, 646 (1967).

*Indictments involving Cardinal, O'Keefe, Howard, Chase,*

---

[2]Testimony by witnesses regarding Hill's false representations to them as to when installation or construction would commence would have been admissible "not for [their] truth but rather to show that the statement[s were] made." *Commonwealth* v. *Sullivan*, 410 Mass. 521, 526 (1991). Admission of the statements was not dependent upon the existence of a joint venture. See *Commonwealth* v. *Brum*, 438 Mass. 103, 116 (2002) (two statements were offered for the nonhearsay purpose, in seeking to establish a joint venture, of showing that the defendant and his alleged coventurer had each "given identically false accounts of the same precise details"). See also *Commonwealth* v. *Leonard*, 352 Mass. 636, 644 n.6 (1967); *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 725 (1973).

*Upton, and Mayo*. As to six other victims, Brian Cardinal, Richard O'Keefe, Henry Howard, George Chase, Gerald Upton, and Nancy Mayo, the evidence was also sufficient to support convictions as a joint venturer with Hill (who himself had formed the intent to defraud by mid-September, 1997, at the latest).

When Hill began working on his own, he received from the defendant the names of people who had called in response to the ads. Hill then contacted these people and arranged to meet with them. With some of these victims, he entered into contracts for the construction of buildings using information received from the defendant as to the cost of the structures and the start dates to be included in the contracts.

By September, customers were calling Hill to complain about lack of progress on their structures. By at least mid-September of 1997, it could be inferred that Hill knew the structures were not being built and that promises to new customers that structures would be built in September or soon afterward could not be fulfilled within any reasonable time frame. On September 7, 1997, Hill discussed with the defendant whether he should stop selling buildings until the work was caught up; but the defendant said "no," instead telling Hill to increase sales. Hill did not question this. Rather, he sought out additional customers subsequent to this conversation, including Cardinal, O'Keefe, Howard, Chase, Upton, and Mayo, telling each individual that construction would be completed by the desired date but knowing full well that the company was behind schedule and could not start any new buildings. He told Upton that he owned the business and had multiple crews to do the work. To Howard he said that the company had a yard where lumber and trucks were stored and that work on Howard's building would be started by November 20, 1997, thereby inducing a deposit.[3] That Hill knew his statements to be false could also be inferred from

---

[3]The defendant further claims that Massachusetts lacked jurisdiction over the crime involving the Howard transaction because there is no evidence that the cash deposit from Howard was in the defendant's possession in Massachusetts. Pursuant to G. L. c. 277, § 58, the crime of larceny may be prosecuted "in any county where the defendant had possession of the property alleged to have been stolen." There was sufficient evidence to establish that a $1,520 cash deposit from Howard, a Connecticut resident who sought to build

misrepresentations (including that the company was actually ahead of schedule) that he made at the time to other customers. Each of these individuals paid Hill a deposit, but none of them received the promised structure.

The jury could have found a joint venture to defraud on the basis of this evidence, from which it could be inferred that at least by mid-September, 1997, Hill had become a knowing accomplice with the defendant in a scheme to defraud potential customers of their deposits, using the approach modeled for him by the defendant. The evidence permits the reasonable inference that Hill and the defendant both knew that Hill's statements regarding the starting dates of construction were false statements of fact; that such statements were made in order to induce customers to part with funds; that in reliance on the false statements, the customers did part with funds which were delivered to the defendant, and that Hill received a share of the funds. "This has been the paradigm of a number of cases resulting in conviction." *Commonwealth* v. *Camelio*, 1 Mass. App. Ct. 296, 300 (1973). See *Commonwealth* v. *Kiernan*, 348 Mass. at 46-48. There was no error in denying the motion for a required finding of not guilty with respect to these six indictments.

*Indictment involving Snide.* We reject the contention that there was no evidence of false statements made to William Snide, who did not testify, or of any direct proof that Snide's structure was never put up. Hill testified that he received a lead from the defendant and in response went to see Snide in October of 1997, entered into a contract with Snide that specified a start date, and received a deposit from Snide which he then turned over to the defendant. Hill further testified that Snide was never

a structure in Maine, was given to Hill, who delivered the cash to the defendant in Massachusetts. It was reasonable to infer that Hill, who testified that he always delivered the payment to the defendant at his home in Massachusetts or a nearby restaurant, did so in this instance.

We also reject the contention that jurisdiction and proper venue in Worcester Superior Court were lacking to try the defendant there on the Howard indictment because the crime did not occur in Massachusetts. Hill's delivery of Howard's cash deposit to the defendant in Worcester County, Massachusetts, demonstrated that the crime occurred, at least in part, in Worcester County. The court had jurisdiction and proper venue to try the Howard indictment. See *Commonwealth* v. *Kiernan*, 348 Mass. 29, 51-54 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts*, 380 U.S. 913 (1965).

given a refund and that no structure was ever built on his property. Additionally, evidence of Hill's misrepresentations to others very near the time he met with Snide bears on the Snide transaction where that evidence showed a comprehensive scheme to defraud. See *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. at 252. Thus, it could reasonably be inferred, based on misrepresentations to Snide and others around the same time, that Hill knew the contract he had given Snide in October, 1997, contained a false statement that work would commence on the specified date.

*Indictment involving O'Connor.* We reject the defendant's claim that the conviction respecting Maura O'Connor cannot stand because, in partially performing his contract with her, he expended funds that exceeded the amounts paid to him by O'Connor.[4] The essential elements of the offense of larceny by false pretenses were satisfied upon evidence that the defendant made statements, false at the time, that induced O'Connor to part with her property ($17,000) which the defendant retained at least for a time. Larceny by false pretenses does not require a specific intent to permanently deprive a victim of property, and neither the intent to repay nor actual repayment is a defense. See *Commonwealth* v. *Hildreth*, 30 Mass. App. Ct. 963, 965 (1991). The evidence of the defendant's false statements to other customers in March and April, 1997, also supports the conviction. See *Commonwealth* v. *Kiernan*, 348 Mass. at 48.

b. *Violation of G. L. c. 142A.* The defendant next claims that the evidence was insufficient to establish his guilt with respect to the three convictions under G. L. c. 142A, § 19, for operating as an unlicensed home improvement contractor. Section 19 provides for a fine not exceeding two thousand dollars or imprisonment not exceeding two years against "[a]ny contractor or subcontractor who shall knowingly, willfully, or negligently operate without obtaining a certificate or registration as required by this chapter . . . ." The defendant does not deny that he had no certificate; rather, he contends that the evidence failed to

---

[4]O'Connor contracted with the defendant for a small feed shelter for horses and a large dog kennel, paying a total $17,000 deposit for which she ultimately received only a foundation and roof for the smaller structure; the defendant claims to have expended $17,771 installing that foundation and roof.

establish that he was engaged in residential contracting which G. L. c. 142A purports to regulate.

We reject the defendant's argument that, because G. L. c. 142A, § 1, defines "residential contracting" to include the "construction of an addition to any pre-existing owner occupied building . . . or to structures which are adjacent to such residence or building," the Commonwealth was required to prove beyond a reasonable doubt that the defendant had knowledge that each structure was to be constructed adjacent to an owner-occupied building.

Ample evidence established that the structures the defendant promised to build and install were to be adjacent to owner-occupied buildings, at least as the term "adjacent" is commonly understood. Cf. *Simas* v. *House of Cabinets, Inc.*, 53 Mass. App. Ct. 131, 136-137 (2001) (rejecting defendant contractor's narrow interpretation of the term "pre-existing owner-occupied building," as defined in G. L. c. 142A, § 1). The Commonwealth was not required to establish beyond a reasonable doubt that the defendant actually knew that the location of proposed structures was adjacent to owner-occupied buildings. If that were the case, a contractor could engage in residential contracting and avoid the registration requirement by the mere expedient of meeting with potential customers away from the customer's premises and then pleading ignorance as to where on the premises the improvements were to be located.

2. *Joint venture instructions.* The defendant claims that the judge erred, both by instructing the jury on joint venture and in his failure to instruct correctly. There was a basis for the joint venture instruction because, as we have discussed, *supra*, the evidence established both Hill's criminal intent to commit the crime of larceny and that he and the defendant were operating in concert.

The defendant further claims that the joint venture instruction in the judge's final charge was erroneous because jurors were not told that they had to find that Hill intended to commit the underlying crime. This claim was raised for the first time in the defendant's motion for a new trial; hence, we review the claim to determine if any error in the joint venture instructions created a substantial risk of a miscarriage of justice. See *Commonwealth*

v. *Scala*, 380 Mass. 500, 510 (1980); *Commonwealth* v. *Graham*, 431 Mass. 282, 286-287, cert. denied, 531 U.S. 1020 (2000).

The trial judge instructed that "in order for [Hill] to be a joint venturer, he must actively participate in [the] particular offense, and that active participation must be done with the specific intent to commit the underlying crime." In his final charge, he further instructed, "[T]here must be some actual active, intentional participation, aid or assistance by [the defendant] in connection with any of the acts performed by Hill. In addition to that, the Commonwealth must prove that [the defendant] shared with Hill the mental state required for the particular crime." These instructions gave the jury the guidance they needed to correctly determine the issue of joint venture. See *Commonwealth* v. *Charles*, 428 Mass. 672, 682 n.7 (1999) (jurors were properly instructed that to find that the defendant acted as a joint venturer, they must conclude that he "entered into an agreement or meeting of the minds with one other coventurer").

3. *Adjudication as a common and notorious thief.* Based on the twenty-three larceny convictions, the judge (with the assent of the defendant's trial counsel) adjudicated the defendant a "common and notorious thief" pursuant to G. L. c. 266, § 40.[5] The judge sentenced the defendant to ten to fifteen years in prison, stating that this was "on all of the larceny indictments."

Relying on *Apprendi* v. *New Jersey*, 530 U.S. 466, 490 (2000) (*Apprendi*), the defendant argues that the jury, not the judge, should have decided the question whether there were three distinct larcenies as the statute requires. In *Apprendi*, the Supreme Court reviewed New Jersey's "hate crime" statute, which provided for an extended term of imprisonment upon a finding by the trial judge upon a preponderance of the evidence that, in committing the underlying hate crime, the defendant " 'acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion,

---

[5]General Laws c. 266, § 40, provides: "Whoever . . . is convicted at the same sitting of the court, as principal or accessory before the fact, of three distinct larcenies, shall be adjudged a common and notorious thief, and shall be punished by imprisonment in the state prison for not more than twenty years or in jail for not more than two and one half years."

sexual orientation or ethnicity.' " *Id.* at 468-469, quoting from N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999-2000). The Court struck down the New Jersey statute upon the familiar principle that "[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 490, citing *Jones* v. *United States*, 526 U.S. 227, 252-253 (1999).

The defendant makes no claim that the evidence was insufficient to convict him of larceny with respect to at least twelve of the indictments, nor that any one of the indictments was improper.[6] The twenty-three indictments charged larceny by false pretenses from twenty-three separate individuals on different dates. In order to convict, jurors were required to determine the facts with respect to each indictment beyond a reasonable doubt. On each indictment, the defendant could not have been "convicted of anything less than a jury's finding of each element beyond a reasonable doubt." *Commonwealth* v. *Beale*, 434 Mass. 1024, 1025 (2001). There was no *Apprendi* violation resulting in the defendant's receiving an enhanced prison sentence on anything less than proof beyond a reasonable doubt.[7]

Moreover, the defendant's sentencing alone avoids any *Apprendi* violation. Each larceny conviction carried a possible

---

[6]Cf. *Commonwealth* v. *North*, 52 Mass. App. Ct. 603, 606 (2001), in which the defendant — who was convicted on twenty-one indictments for larceny by false pretenses from four clients — claimed that because the monies were taken pursuant to a single larcenous scheme, a conviction of more than four larcenies inflicted multiple punishments for the same offense in violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution. We rejected the claim, noting that "the defendant committed a multitude of separate acts on different dates by differing artifices," and we went on to observe that "[i]t is not reasonable to believe that, in enacting [the larceny statute], the Legislature intended that a person who steals [a large sum of money by] separate takings is subject to no greater maximum penalty than is one who steals [a small amount from a victim] on one occasion." *Ibid.* We distinguished such a case from the circumstances present in *Commonwealth* v. *Donovan*, 395 Mass. 20, 27-29 (1985), where although there were several different victims, the defendant committed a single act when he superimposed a phony bank night deposit box over a real one. *Ibid.*

[7]We note that in *Commonwealth* v. *Crocker*, 384 Mass. 353, 355 (1982), decided prior to *Apprendi*, the court held that there was no constitutional compulsion to notify the defendant in the indictment that he might be sentenced under G. L. c. 266, § 40. "The defendant . . . is simply being

maximum five-year prison sentence, thus exposing him to consecutive sentences of up to one hundred and fifteen years. See G. L. c. 266, § 30. By comparison, an adjudication and consolidated sentencing under the common and notorious thief statute exposed the defendant to a maximum prison sentence of only twenty years. That is unlike the situation in *Apprendi* where, upon the judge's finding by a mere preponderance of the evidence that the baseline hate crime offenses had been committed with a biased purpose toward a specific group, the defendant faced an enhanced maximum aggregate sentence up to ten years longer than the maximum twenty-year consecutive sentences he could have received on the baseline offenses alone. *Apprendi, supra* at 470. Here, the defendant was not exposed to an enhanced sentence as a consequence of being adjudicated a common and notorious thief by the trial judge. "[N]o *Apprendi* violation occurs as long as the defendant receives a sentence below the default statutory maximum applicable to the [baseline offense]." *United States* v. *Duarte*, 246 F.3d 56, 60 (1st Cir. 2001). See *United States* v. *Page*, 232 F.3d 536, 545 (6th Cir. 2000), cert. denied, 532 U.S. 935 and 532 U.S. 1023 and 532 U.S. 1056 (2001); *United States* v. *Smith*, 240 F.3d 927, 930 (11th Cir. 2001). In this case, the defendant received less than the "default maximum." There was no error in adjudicating him a common and notorious thief.

4. *Ineffective assistance of trial counsel.* The defendant claims he received ineffective assistance from his trial counsel who he says (1) failed to object to the joint venture instruction; (2) did not move to strike the testimony of Howard, a Connecticut resident and one of the victims; (3) should not have requested that the defendant be adjudicated a common and notorious thief; and (4) failed to object to the prosecutor's closing. Because we have determined that there was no error in the instructions, that the court did not lack jurisdiction over the charge involving Howard, and that the defendant's conviction under G. L. c. 266, § 40, was proper, counsel's objections on these points would have been unavailing and "[t]he defendant could not have been

given one consolidated sentence for the three larceny offenses of which he has been duly convicted." *Ibid.*

harmed by counsel's supposed inaction in those respects." *Commonwealth* v. *Beauchamp*, 49 Mass. App. Ct. 591, 610 (2000).

We also find no merit in the defendant's further claims that his trial counsel was ineffective because his arguments were not persuasive and that he failed to present exculpatory evidence or organize other evidence in such a way that jurors could understand its true import.[8] "[T]he basic trouble from the defense standpoint was weaknesses in the facts rather than any inadequacy of counsel." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 111 (1977). "Examining the alleged errors in light of the entire trial, we think that the presentation of the defendant's case was not prejudiced in any material manner." *Commonwealth* v. *Medina*, 20 Mass. App. Ct. 258, 259 (1985). See *Commonwealth* v. *Boateng*, 438 Mass. 498, 513 (2003).

5. *Prosecutor's closing remarks.* The defendant claims that several of the prosecutor's remarks in his closing argument were improper and require reversal.[9] We address briefly only those claims supported in the defendant's brief by citation to

---

[8]Responding to this claim, the motion judge, who was also the trial judge and had the opportunity to observe defense counsel in action, found as follows:

> "Defense counsel made a forceful argument on [the defendant's] motion for a required finding of not guilty regarding whether false statements were made. [The defendant's] trial counsel presented to the jury in an organized fashion [the defendant's] check registers, bank statements, and other data, as well as witness testimony that [the defendant] had paid bills to suppliers, had legitimate business expenses and had built some buildings. Defense counsel's closing argument focused on the elements of the crime and asserted that [the defendant] was merely an inexperienced businessman with good intentions who was experiencing difficulties in his personal life. With one hundred and twenty-one exhibits on their hands, the jurors were armed with sufficient information on which to reach a fair result."

[9]These claims, to which the defendant had registered no objection at trial, were resurrected by the judge's treatment of them in connection with the defendant's motion for a new trial. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 555 (1998) ("any issue argued in the appeal from the denial of the defendant's motion for a new trial that the motion judge fully addressed on its merits must be considered as if properly preserved for direct appeal"). As to these issues, "[t]he standard of review . . . is one of prejudicial error . . . ." *Commonwealth* v. *Mejia*, 407 Mass. 493, 497 (1990). See *Commonwealth* v. *Erdely*, 430 Mass. 149, 150 (1999).

relevant authority. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Commonwealth* v. *Montez*, 45 Mass. App. Ct. 802, 807 n.2 (1998).

The prosecutor's single reference to one customer as "pregnant" (after defense counsel had already referred to her in that same manner) was an attempt to distinguish her from the many other witnesses who appeared before the jury. It was not done to appeal to jurors' emotions or to elicit improper sympathy from them. *Commonwealth* v. *Santiago*, 425 Mass. 491 (1997), relied on by the defendant, is inapposite. There, reversible error occurred when, during open and closing arguments, the prosecutor stated twelve times that the victim was seventeen and pregnant when she was murdered the day before her birthday. *Id.* at 494, 506.

The prosecutor referred twice to "the type of person" the defendant was. One reference to the number of indictments against the defendant did not amount to an improper attack on the defendant's character. Rather, the prosecutor was merely highlighting the fact that twenty-three separate indictments had been joined for trial pursuant to Mass.R.Crim.P. 9(a)(1), 378 Mass. 859 (1979). Related offenses may be so joined when they arise out of a course of criminal conduct or series of criminal episodes constituting parts of a single scheme or plan; they "show[] a common scheme and pattern of operation that tends to prove all of the indictments." *Commonwealth* v. *Feijoo*, 419 Mass. 486, 494-495 (1995). Compare *Commonwealth* v. *Chase*, 26 Mass. App. Ct. 578, 584 (1988), where prosecutor's closing remarks, to the "type of person" and "kind of man" the defendant was, were deemed improper because they suggested to jurors that they could consider as substantive evidence the defendant's prior bad acts, which had been admitted solely to show motive and state of mind.

The prosecutor's argument — that a letter sent by the defendant to a victim was intended "to intimidate and bully and cajole [the victim] into being afraid of him, and that's the type of person [the defendant] is" — would better have been left unsaid. On the whole, however, we do not think the reference tainted the jury's verdict. See *Commonwealth* v. *Heard*, 360 Mass. 855, 855 (1971) ("The jury's verdicts were not tainted

because the prosecution in its argument referred to the defendant as a 'bully' ").

Other remarks by the prosecutor in his closing argument to which the defendant now objects include isolated comments possibly suggesting (1) a shifting of the burden of proof to the defendant; (2) that there were additional, uncharged incidents of larceny by false pretenses; and (3) that jurors' duty was to convict the defendant.

The prosecutor ought not have suggested that the defendant had any burden at trial, even "an entirely different burden, a lesser burden," than that of the Commonwealth.[10] Cf. *Commonwealth* v. *Habarak*, 402 Mass. 105, 111 (1988) ("As a general rule, . . . rhetorical questions should not be used in closing argument where they could be perceived by the jury as shifting the Commonwealth's burden of proof to the defendant"). We do not think the isolated comment went so far as to suggest that the burden shifted to the defendant. Even if it had done so, the error was cured by the judge's specific instruction that "[t]he presumption of innocence . . . means that a defendant in a criminal case is under no obligation to prove his innocence. . . . The burden never shifts to the defendant to prove his innocence." See *Commonwealth* v. *Francis*, 391 Mass. 369, 373-74 (1984) (statements by the judge insulated the jury from improper remarks by the Commonwealth).

The prosecutor's statement that evidence showed that "there were a couple" of buildings that had been built by the defendant, when it could be inferred from the evidence that there were more, was at most an overstatement of a collateral issue that could not have misled the jury, particularly where the judge emphasized in his charge that arguments of counsel were not to be considered as evidence and that jurors were to decide the facts based exclusively on the evidence. See *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. at 258.

The defendant did not object at trial, nor did he raise in his

---

[10]The prosecutor stated in closing: "Ladies and gentlemen, it is our burden to prove each and every indictment beyond a reasonable doubt, and we accept that burden, and I suggest to you the evidence has proven that. The defendant, who is under an entirely different burden, lesser burden, now stands before you and says, you know, I built buildings. I built buildings. That has nothing to do with these 23 victims."

motion for a new trial the further claim that the prosecutor improperly suggested to the jury that it was their duty to convict.[11] We review this claim to determine whether the alleged error created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Graham*, 431 Mass. at 286-287. Under that standard, "[w]e analyze the remarks in 'light of the "entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial." ' " *Commonwealth* v. *Delaney*, 425 Mass. 587, 599 (1997), cert. denied, 522 U.S. 1058 (1998) (citations omitted).

This impermissible statement was coupled with a correct statement of the law (that the jury were to apply the law to the facts they had heard) and was reinforced by the judge's instructions that the jury were to apply the law provided by the judge to the facts of the case. Hence, the statement did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Lyons*, 426 Mass. 466, 471-472 (1998) (no substantial risk of a miscarriage of justice when the jury were told to consider all the evidence in a rational manner after being told they had a duty to convict).

In sum, these remarks, even assuming they were improperly suggestive, were cured by the judge's proper instruction regarding the Commonwealth's burden of proof (including an instruction that the defendant has no burden of proving his innocence) and an instruction that closing remarks are not to be considered as evidence.

6. *Other claims.* The defendant claims for the first time on appeal that the trial judge abused his discretion in denying his request for new counsel. The defendant twice informed the trial judge that he and his trial counsel disagreed over trial strategy and that he no longer wanted him as his attorney. "A motion to discharge counsel, when made on the eve of trial, or on the day on which trial is scheduled to begin, 'is a matter left to the sound discretion of the trial judge.' " *Commonwealth* v. *Tuitt*, 393 Mass. 801, 804 (1985), quoting from *Commonwealth* v.

---

[11]The prosecutor told the jury: "When you apply the law that the judge gives you to the facts that you heard, you will know that he is guilty of each indictment before you, and it will be, I suggest to you, your duty to bring back guilty verdicts against him."

*Moran*, 388 Mass. 655, 659 (1983) (trial judge has discretion to change counsel, but only after letting the defendant articulate reasons for the request). The defendant was given the opportunity to articulate the reasons for his dissatisfaction, thereby allowing the trial judge to decide on an informed basis that trial counsel was doing a satisfactory job and would not be removed. There was no abuse of discretion in denying the request for new counsel and no substantial risk of a miscarriage of justice.

Other claims raised by the defendant provide no basis for reversal.

*Judgments affirmed.*

*Order denying the motion*
*for new trial affirmed.*