Charles R. LAWSON, as he is Trustee
of Trust 55547–90, Trust 12572
and Trust 9932–90

v.

AFFIRMATIVE EQUITIES COMPA-
NY, L.P., Affirmative Equities, Inc.,
Patrick Henry Hotel Associates, L.P.,
Patrick Henry Hotel Investment Asso-
ciates, L.P., Andrew D. Jubelt, and
Lawrence Bishop

No. CIV.A.02–12172–RGS.

United States District Court,
D. Massachusetts.

Oct. 27, 2004.

Heather V. Baer, Sally & Fitch, Boston, MA, for Lawrence A. Bishop, Defendant.

Peter E. Ball, Sally & Fitch LLP, Boston, MA, for Lawrence A. Bishop, Defendant.

David S. Friedman, Hill & Barlow, PC, Boston, MA, for Affirmative Equities, Patrick Henry Hotel Associates, LP, Andrew D. Jubelt, Defendants.

Ann Pauly, Griesinger, Tighe & Maffei, LLP, Boston, MA, for Charles R. Lawson, Plaintiff.

Richard M. Resnik, Mandel Resnik & Kaiser P.C., New York, NY, for Affirmative Equities, Patrick Henry Hotel Associates, LP, Andrew D. Jubelt, Defendants.

C. Dylan Sanders, Piper Rudnick LLP, Boston, MA, for Affirmative Equities, Patrick Henry Hotel Associates, LP, Andrew D. Jubelt, Defendants.

*MEMORANDUM AND ORDER ON DE-
FENDANTS' MOTIONS TO DIS-
MISS THE SECOND AMENDED
COMPLAINT*

STEARNS, District Judge.

This action arises from an Agreement of Guaranty executed by defendant Affirmative Equities Company, L.P. (AEC) in favor of the plaintiff, Charles Lawson, as the Trustee of three Massachusetts Trusts that guaranteed a Letter of Credit extended to AEC by the Republic National Bank of New York, later known as HSBC Bank USA (HSBC). The Letter of Credit was intended to finance the renovation of The Patrick Henry Hotel (the Hotel), a property in Roanoke, Virginia, owned by AEC and its affiliates. Lawson's Second Amended Complaint alleges breach of contract, fraud and deceit, breach of the covenant of good faith and fair dealing, unjust enrichment, negligent misrepresentation, promissory and equitable estoppel, violations of the Massachusetts Consumer Protection Act, and breach of fiduciary duty (as against defendant Lawrence Bishop).[1] The issues are complicated by the bewildering web of legal relationships that connect the Patrick Henry Hotel defendants. These defendants, Affirmative Equities, Inc. (AEI), Patrick Henry Hotel Associates, L.P. (PHHA), Patrick Henry Hotel Investment Associates (PHHIA), and Andrew D. Jubelt, joined by Bishop, move to dismiss the Second Amended Complaint, principally on the ground that the court lacks personal jurisdiction. The Patrick Henry Hotel defendants also claim that AEC (which is insolvent) is the only entity liable on the Agreement of Guaranty.[2]

## BACKGROUND

The following facts, viewed in the light most favorable to the plaintiff, are drawn for the most part from the Second Amended Complaint, supplemented by those facts that either appear not to be in dispute, or are among the facts that were developed during the jurisdictional discovery authorized by the court. AEC is a Delaware limited partnership.[3] AEC is the general partner of PHHIA, a New York general partnership, which in turn is the general partner of PHHA, a Delaware limited partnership. PHHA is the record owner of The Patrick Henry Hotel. AEI, a New York corporation, is the general partner of AEC. Jubelt is the sole officer and shareholder of AEI. Jubelt owns and manages Patrick Henry Hotel Investors, Inc. (PHHI), which has a 99 percent ownership interest in PHHIA. Jubelt also owns 75 percent of AEC's one percent general partner's interest in PHHIA. Jubelt and Bishop constitute the board of directors of AEI, while Bishop also serves as a director of AEC. Until the summer of 2001, Bishop was a part owner and an investment advisor at Gray Seifert, a New York capital management firm. Lawson and the Trusts had become clients of Bishop in 1988.

According to the Complaint, Bishop regularly financed the activities of AEC and Jubelt with client funds in the custody of Gray Seifert.

---

1. Bishop is not named in the breach of contract count (although he is somewhat inconsistently named as a defendant in the contractually-related estoppel and unjust enrichment counts).

2. AEC is not a moving party in the motion to dismiss.

3. The reader is advised to take pen to paper at this point and chart the relationships among the various defendants to avoid otherwise certain confusion.

When Jubelt asked Bishop for money, defendant Bishop would cause those Gray Seifert clients' funds to be transferred to AEC, purportedly as an investment in, or loan to, AEC or one of its projects or affiliates.... AEC, with Bishop's knowledge, used those funds, in whole or in part, to pay for AEC operating expenses, including the payment of substantial salaries and benefits to, *inter alia*, defendant Jubelt.

Second Amended Complaint ¶ 12. In 1993, defendants AEI, AEC, PHHA, PHHIA and Jubelt sought a $2,500,000 Letter of Credit from HSBC. The requested funds were to be advanced to PHHIA and PHHA, ostensibly to pay for the remodeling of the Hotel. HSBC refused to issue the Letter of Credit without a guaranty from a third party unaffiliated with the defendants. As a result, the Patrick Henry Hotel defendants, through Bishop, contacted Lawson to solicit a guaranty from the Trusts. Jubelt and Bishop proposed that Lawson pledge Trust assets to secure the Letter of Credit, in exchange for the payment by PHHA and PHHIA of commissions and monthly service fees (interest) to the Trusts.

As alleged in the Complaint, the proposal was embellished by a number of representations that later proved false. Jubelt and Bishop told Lawson that: (1) the Letter of Credit and the Trusts' guarantees would be in force for only a few months; (2) that the Letter of Credit would be secured by The Patrick Henry Hotel and the assets of AEC and its affiliates; (3) that AEC and AEI had sufficient assets to pay off the Letter of Credit when it came due; (4) that PHHA would maintain an escrow account with a balance sufficient at all times to pay three months of the interest owing to HSBC; and (5) that AEC would provide Lawson (and the Trusts) with an enforceable Agreement of Guaranty that would ensure the payment of all

sums drawn against the Letter of Credit. On July 13, 1993, PHHA executed a Letter Agreement, which was forwarded to Lawson in Massachusetts. *See* Second Amended Complaint, Ex. A. In the Letter Agreement, PHHA promised: (1) to pay each of the Trusts the sum of $6,000 upon the issuance of the Letter of Credit; (2) to use its best efforts to find substitute financing within six weeks (thereby discharging the Trusts from the guarantees); (3) to pay each Trust the sum of $25,000 upon the receipt of refinancing; and (4) in the event that refinancing was not in place by August 31, 1993, to pay each Trust, on the first day of each succeeding month in which refinancing had not been obtained, the sum of $2,000. The Letter Agreement was signed on behalf of PHHA by an officer of its general partner, PHHIA.

Immediately after HSBC issued the Letter of Credit, the full $2,500,000 was drawn down by the defendants. In mid–1994, after making sporadic interest payments to the Trusts with checks signed by the Chief Financial Officer (CFO) of AEC and PHHA, the Patrick Henry Hotel defendants ceased making payments. The defendants persuaded HSBC to grant a series of extensions on the repayment of the Letter of Credit, and in 1997, agreed with HSBC to convert the Letter of Credit into a Demand Note. The defendants also sought funding from third party sources, including Titan Management, L.P. (Titan), to pay off a Department of Housing and Urban Development (HUD) mortgage on the Hotel. (Lawson had not been told of the prior mortgage nor that HUD had twice threatened to foreclose on the Hotel because the mortgage was in arrears).

AEC from time to time revised the Agreement of Guaranty to reflect the accrued interest owed to the Trusts. The

last such revision occurred in July of 1998.[4] Lawson alleges that when Jubelt signed the revised Agreement of Guaranty on July 10, 1998, he knew, but fraudulently concealed the fact that AEC, AEI, PHHA, and PHHIA were insolvent. Bishop, for his part, told Lawson that he "should not be concerned with the payments owed to the trusts since the hotel will probably be sold by the end of this year. At that time, accrued interest would be paid to the trusts." Third Pauly Aff., Ex. 5.

In August of 2001, Lawson received a letter from Gray Seifert announcing Bishop's resignation from the firm. The following month, Lawson was told by Gray Seifert that it was no longer offering "private investment deals," and that it was in the process of reviewing its underperforming private equity holdings. (Lawson believes that Gray Seifert's sudden retrenchment was prompted by the faltering investments Bishop had placed in AEC and its affiliates). In early October of 2001, Jubelt and Bishop separately assured Lawson that AEC had sufficient assets to cover the Agreement of Guaranty and to repay the Demand Note upon the impending sale of The Patrick Henry Hotel. Lawson asked Jubelt to forward copies of the closing documents to verify that the interest and fees owed to the Trusts would be paid from the proceeds. Lawson never received the requested documents.

On November 30, 2001, HSBC sent defendants AEI, AEC, PHHA, PHHIA, and Jubelt a letter demanding payment in full of the principal and interest due under the Demand Note. Lawson immediately wrote to Jubelt and AEC invoking the Trusts' rights under the Agreement of Guaranty.

Defendants responded by insisting that the Trusts assume the interest payments on the Demand Note. Lawson in turn sought a written acknowledgment from the defendants that the Demand Note, and the accrued interest and fees, would be paid in full on the sale of The Patrick Henry Hotel (ostensibly to occur on February 28, 2002). The Patrick Henry Hotel defendants refused to sign the acknowledgment. However, as late as December of 2001, Bishop reassured Lawson that the February date for the sale of the Hotel was firm, and that the Demand Note and the interest and fees owed to the Trusts would be paid in full.[5]

On January 3, 2002, Jubelt and John Hrvatin, the CFO of AEC and PHHA, met with Lawson in Boston. During the meeting, Jubelt and Hrvatin informed Lawson that AEC was having difficulty meeting its day-to-day financial obligations, and that The Patrick Henry Hotel had been operating at a loss for almost ten years. They provided Lawson with a document entitled "Projected Sources and Uses of Funds," which showed that of the $11,775,000 expected upon the sale of the Hotel, only $1,203,918 had been allocated toward the repayment of the $2,500,000 due under the Demand Note. Moreover, of that $1,203,918, only a sum of between $156,633 and $470,411 was to be paid in cash, while the remainder was to be paid in "residual" unsecured bonds, which Jubelt and Hrvatin acknowledged HSBC would not accept. Jubelt and Hrvatin told Lawson that they fully expected (and were counting upon) HSBC to move against the assets of the Trusts to satisfy any deficiency. Jubelt also told Lawson that the previously undis-

---

4. The revised Agreement of Guaranty is attached to the Second Amended Complaint as Exhibit D.

5. At the June 16, 2004 hearing on the motion to dismiss, in response to a question by the court, defendants' attorneys stated that the sale of the Hotel has yet to take place.

closed HUD mortgage had prohibited the placement of a second mortgage on The Patrick Henry Hotel, and that, consequently, the defendants had taken no steps to secure the HSBC loan.

Following the January 2002 meeting, Jubelt and Hrvatin told Lawson "that AEC [could not] honor the AEC Guaranty, and provided Lawson with an updated 'Projected Sources and Uses of Funds' chart showing that, as of September 30, 2002, the amount of any proceeds from a sale of The Patrick Henry Hotel that the defendants conceivably might allocate toward repaying the debt evidenced by the Note ha[d] decreased dramatically from the amount shown in the chart presented at the January 3, 2002 meeting." Second Amended Complaint ¶ 36. Jubelt later threatened that the Patrick Henry Hotel defendants would stop interest payments on the Demand Note, thereby causing HSBC to foreclose on the assets of the Trusts, if Lawson persisted in attempting to enforce the Trusts' rights under the Agreement of Guaranty.[6]

In November of 2002, after defendants removed the Complaint from the Middlesex Superior Court, Lawson sought an injunction prohibiting the defendants from selling, conveying, or further encumbering The Patrick Henry Hotel without the prior approval of the court. On November 22, 2002, the court granted the requested relief. Lawson maintains that in direct contravention of the court's Order, defendants have placed an additional $374,201 in secured debt and more than $1,115,030 in unsecured debt on the Hotel (increasing the debt burden with interest by some $3,606,131) since the injunction entered.[7]

On June 16, 2004, the court heard argument on the defendants' motions to dismiss. At the conclusion of the hearing, the court made tentative rulings on the motions, but gave Lawson an opportunity to amend the Complaint to include allegations based on information learned at a post-pleadings deposition of Bishop. On July 6, 2004, Lawson filed the Second Amended Complaint. On August 18, 2004, Bishop filed a renewed motion to dismiss. The remaining defendants rely on their prior briefing of their companion motion.

## DISCUSSION

### Personal Jurisdiction

■ Each of the defendants asserts that this court lacks personal jurisdiction. As a rule, a court should determine whether Article III jurisdiction exists before reaching the merits of a plaintiff's claim. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). If challenged, the burden is on the plaintiff to show a prima facie case authorizing personal jurisdiction. *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.*, 894 F.2d 9, 11 (1st Cir.1990). Mere reliance on the allegations of the pleadings is not enough. *Chlebda v. H.E. Fortna & Brother, Inc.*, 609 F.2d 1022, 1024 (1st Cir.1979). But, "[i]f the plaintiff makes a prima facie showing of jurisdiction supported by specific facts alleged in the pleadings, affidavits, and exhibits, its burden is met."[8]

---

6. At the June 16, 2004 hearing on the motion to dismiss, counsel informed the court that HSBC has yet to take any action with respect to the Trusts' assets, nor has the court been informed that any action has been taken as of the date of this opinion.

7. Lawson has made no effort to involve the court in any redress of the alleged defiance of its injunctive orders.

8. Where, as here, a court has authorized jurisdictional discovery, the plaintiff's prima facie showing will often be as fully developed in its facts as would be expected on summary judgment.

*Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 979 (1st Cir.1986). Under the prima facie test "a district court does not act as a factfinder; to the contrary, it ascertains only whether the facts duly proffered, fully credited, support the exercise of personal jurisdiction." *Rodriguez v. Fullerton Tires Corp.,* 115 F.3d 81, 84 (1st Cir.1997).

"In its simplest formulation, *in personam* jurisdiction relates to the power of a court over a defendant. It is of two varieties, general and specific. General personal jurisdiction ... is the power of a forum-based court ... 'which may be asserted in connection with suits not directly founded on [that defendant's] forum-based conduct....'" *Pritzker v. Yari,* 42 F.3d 53, 60 (1st Cir.1994), quoting *Donatelli v. National Hockey League,* 893 F.2d 459, 462–463 (1st Cir.1990). The assertion of general jurisdiction comports with due process when (1) there are "continuous and systematic general business contacts" between the foreign defendant and the forum, and (2) the exercise of jurisdiction is reasonable under the so-called Gestalt factors. *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 618 (1st Cir. 2001). "Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to,

the defendant's forum-based contacts.'" *Pritzker,* 42 F.3d at 60. "The proper exercise of specific *in personam* jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the [Due Process Clause of the] Constitution." [9] *Id.*

The Fourteenth Amendment's concern for fundamental fairness is reflected in the requirement that there be certain "minimum contacts" between the defendant and the forum state in order for specific jurisdiction to exist.[10] The "minimum contacts" test is in three parts. "First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable." *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992).

**9.** Under the Massachusetts long-arm statute, "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; ... [or] (c) causing tortious injury by an act or omission in this commonwealth." G.L. c. 223A, §§ 3(a) and (c). Massachusetts courts construe section 3(a)'s "transacting business" test as extending jurisdiction to the outermost limit permitted by the Due Process Clause. *See Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik,* 295 F.3d 59, 63 (1st Cir. 2002).

**10.** Lawson asserts that Bishop repeatedly participated in the economic life of the Commonwealth by soliciting clients in Massachusetts for more than a decade, thereby satisfying section 3(d) and the fairness requirements for "general jurisdiction." As this court (as will be seen) has personal jurisdiction over Bishop under sections 3(a) and 3(c) of the Massachusetts long-arm statute, there is no reason to explore this more demanding (and doubtfully applying) doctrine. *See Noonan v. Winston Co.,* 135 F.3d 85, 93 (1st Cir.1998) (the standard for evaluating the constitutional sufficiency of a defendant's contacts with the forum is significantly more stringent under the doctrine of general jurisdiction than in the case of specific jurisdiction).

"[T]he relatedness test is, relatively speaking, a flexible, relaxed standard." *Pritzker*, 42 F.3d at 61. *See Cambridge Literary Properties*, 295 F.3d at 63 ("relatedness" is a broader concept than "arising from"). However, "[t]he relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir.1995) (the mere existence of an agency relationship, without more, does not confer jurisdiction). Moreover, contract and tort claims are subject to differing analyses. "[I]f a contract claim, our stereotypical inquiry tends to ask whether the defendant's forum-based activities are 'instrumental in the formation of the contract,' ... if a tort claim, we customarily look to whether the plaintiff has established 'cause in fact' (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action.)." *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 35 (1st Cir.1998). *See also Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir.1999) (commending the district court's decision to analyze jurisdiction over the contract and tort claims separately).

In determining whether a defendant has "purposefully availed" itself of the privilege of conducting activity in the forum state, a court is to focus on the nature of the contact with the forum and avoid playing a "numbers game"—a single, meaningful contact with the forum, even by means of a virtual presence, "can fill the bill." *Pritzker*, 42 F.3d at 61 (citing *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), for the proposition that a contractual relationship may be sufficient to confer jurisdiction even where the defendant does not physically enter the forum). *See also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 62 (1st Cir.2002) (telephone, e-mail, and fax communications directed to the forum state in contemplation of contractual services being in part performed in that forum are evidence of jurisdictional contact).

The third and final prong of the test requires consideration of the Gestalt factors. These test the comportment of an assertion of jurisdiction with traditional notions of fair play and substantial justice. The factors include "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *163 Pleasant St. Corp.*, 960 F.2d at 1088.

Bishop acknowledges that his initial contacts with Lawson regarding The Patrick Henry Hotel took place in Massachusetts, but maintains that "all subsequent substantive negotiations concerning the guarantees by the Trusts of the Letter of Credit and the guaranty of the Trusts' obligations pursuant to the Trusts' Guarantees were conducted between [Lawson] and Andrew Jubelt or other employees or agents of AEC, AEI, PHHIA or PHHA." Second Bishop Aff. ¶ 4. *But see Cambridge Literary Properties*, 295 F.3d at 66 ("[F]or purposes of specific jurisdiction, contacts should be judged when the cause of action arose, regardless of a later lessening or withdrawal."). Lawson vigorously disputes Bishop's attempts to minimize his contacts with Massachusetts. According to Lawson, Bishop "solicited the guarantees from the Trusts in Massachusetts,

[and] remained directly in the middle of the negotiation and post-transaction communications with [Lawson]." Opposition to Bishop's Motion to Dismiss, at 4.

By Lawson's account, beginning in 1994 and continuing through 2001, Bishop repeatedly told him (in Massachusetts) that "the HSBC Guarantees were 'a great deal for the Trusts,' and that the Trusts were not at any risk, that he (Bishop) was on the Board of Directors of AEC and AEI and had personal knowledge that those defendants had sufficient financial assets to satisfy all obligations under the AEC Guaranty." *Id.* at 5. On numerous occasions between 1999 and 2001, Bishop assured Lawson (in Massachusetts) that the sale of The Patrick Henry Hotel was imminent, and that the Demand Note would be paid off in full at the closing. *Id.* Jubelt, for his part, admits meeting with Lawson in Massachusetts in late 2001 and the beginning of 2002 to discuss the status of The Patrick Henry Hotel, the Agreement of Guaranty, and the Demand Note, although he claims that the meetings were convened at Lawson's insistence to allay his "expressed concerns about PHHA." [11]

The existence of personal jurisdiction insofar as it involves Lawson's contractual claims requires little by way of extended discussion. Bishop's solicitation of Lawson in Massachusetts on behalf of the Patrick Henry Hotel defendants was the precipitating event that led to the parties' contractual entanglements.[12] The contract involving the Letter of Credit was formed in Massachusetts on the execution of the guarantees, while the Letter Agreement promising the payment of interest and fees, and the documents and other communications related to the Patrick Henry Hotel defendants' performance (such as it was), were directed to Lawson in Massachusetts. Finally, notice of the defendants' intention to breach their contractual obligations to the Trusts was delivered to Lawson by Jubelt and Hrvatin at a meeting held in Boston.[13] The contractual contacts with the Massachusetts forum by Bishop and the Patrick Henry Hotel defendants far exceeded those found sufficient to establish personal jurisdiction in *Daynard*, 290 F.3d at 61–63.[14]

■ The tort-based fraud claims present a more complex issue. The allegations of fraud fall into two clusters. The first

11. Jubelt maintains that a previous encounter in Massachusetts cited by Lawson (in the early 1990's) involved an unrelated investment.

12. For purposes of personal jurisdiction, "the agent's actions may be attributed to the principal if the principal later ratifies the agent's conduct." *Daynard*, 290 F.3d at 55. The Patrick Henry Hotel defendants argue that in soliciting Lawson, Bishop was acting on behalf of Gray Seifert. However, given the facts that Bishop was a director of AEC and AEI, and that AEC and AEI and the other Patrick Henry Hotel defendants (as opposed to Gray Seifert) were the beneficiaries of the solicitation of the Trusts, for purposes of the prima facie jurisdiction test, Bishop's conduct is attributable to these defendants.

13. The Patrick Henry Hotel defendants' argument that jurisdiction lies in New York because the assets of the Trusts were in the

custody of a New York bank is somewhat puzzling. The Trusts are legal entities created under Massachusetts law and domiciled in Massachusetts. Where the Trust assets happened to be invested has no bearing on the jurisdictional analysis.

14. Massachusetts, in applying the "transacting any business" test, places special emphasis on solicitation by a defendant. *See Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994) ("[G]enerally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy [the transacting] requirement."). *See also Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 61 Mass.App.Ct. 537, 540–541, 812 N.E.2d 278 (2004).

involves the false representations that were made to induce the Trusts to enter into the guarantee arrangement. These include the representations that the guarantees would be of limited duration, that the Letter of Credit would be fully secured, that there was no appreciable risk of loss in the transaction, and that the Patrick Henry Hotel defendants had sufficient assets to meet the obligations of the Agreement of Guaranty. The second cluster involves both affirmative misrepresentations and acts of concealment undertaken after the contract was formed in order to induce Lawson to forgo any attempt to enforce the Trusts' contractual rights. These include the defendants' positive assurances that the Trusts were fully secured by the assets of the Patrick Henry Hotel defendants (when in fact most of these entities were insolvent), and the concealment of the fact that the Hotel was encumbered by prior mortgages.

While a number of the alleged fraudulent acts and omissions occurred outside the Commonwealth, Massachusetts applies an expansive "but for" train-of-events test to the assertion of jurisdiction over tort claims that arise out of a contractual relationship. *See Tatro,* 416 Mass. at 770–771, 625 N.E.2d 549.[15] "Logically, there is no reason why a tort cannot grow out of a contractual contact.... [T]he contractual contact is a 'but for' causative factor for the tort since it [brings] the parties within tortious 'striking distance' of each other." *Id.* at 770, 625 N.E.2d 549, quoting *Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1270 n. 21 (5th Cir.1981). As the court's personal jurisdiction in this diversity action is governed by the Supreme Judicial Court's interpretation of the Massachusetts long-arm statute, under the "but for" test, jurisdiction attaches to both the contract and the related tort claims.[16]

The first two prongs of the personal jurisdiction test (relatedness and purposeful availment) having been satisfied, the Gestalt factors come into play. Defendants, who are for the most part sophisticated business entities with real estate investments in a number of states, point to no "special" or "unusual" burden in defending the case in Massachusetts, nor is there any evidence that the suit was brought for purposes of harassment. *Pritzker,* 42 F.3d at 64; *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 211 (1st Cir.1994). With respect to the second factor, Massachusetts has a significant interest in obtaining jurisdiction over nonresident defendants whose conduct causes injury to its citizens, an interest at least as

---

**15.** In *Tatro,* the Supreme Judicial Court rejected "the restrictive proximate cause approach" taken by the First Circuit in interpreting the transacting business requirement of G.L. c. 223A, § 3(a). *See Nowak v. Tak How Investments, Ltd.,* 94 F.3d 708, 713 (1st Cir.1996) ("At least for purposes of construing the Massachusetts long-arm statute, the Supreme Judicial Court of Massachusetts dealt our restrictive interpretation a fatal blow ....").

**16.** The argument that the "but for" test is so overinclusive as to infringe the "fair warning" (foreseeability) requirement of the Due Process Clause was considered, but ultimately rejected by the First Circuit in *Nowak.*

When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result. The corporation's own conduct increases the likelihood that a specific resident will respond favorably. If the resident is harmed while engaged in activities integral to the relationship the corporation sought to establish, we think the nexus between the contacts and the cause of action is sufficiently strong to survive the due process inquiry at least at the relatedness stage.

*Id.,* 94 F.3d at 715–716.

compelling as that of a sovereign concerned with the rights of its citizens called to defend a lawsuit in a foreign forum. *Cf. Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 151 (1st Cir.1995) ("The purpose of the inquiry is not to *compare* the forum's interest to that of some ·other jurisdiction, but to determine the extent to which the forum *has* an interest."). Lawson's interest in obtaining effective relief is obvious, and his choice of Massachusetts as the forum in which to seek relief deserves deference. *Id.* The fourth factor, the judicial system's interest in obtaining the most efficacious resolution of the controversy, counsels against the piecemeal litigation that would result if the contract and tort claims were to be severed. *Pritzker,* 42 F.3d at 63–64. And finally, with respect to substantive social polices, Massachusetts has a substantial interest in redressing harms inflicted on its citizens by out-of-state defendants as well as in providing a convenient forum in which its citizens may seek relief. *See Nowak,* 94 F.3d at 719. On balance, the Gestalt factors favor a Massachusetts forum for the trial and resolution of all claims.

*Breach of Contract*

█ A motion to dismiss under Rule 12(b)(6) must be denied "unless it appears to a certainty that the plaintiff would be unable to recover under any set of facts." *Roma Construction Co. v. aRusso,* 96 F.3d 566, 569 (1st Cir.1996). Count I of the Second Amended Complaint asserts a claim for breach of contract, alleging that

the Patrick Henry Hotel defendants have "failed to make the agreed upon payments of interest or fees . . . and have breached the AEC Guaranty." ' Defendants' motion to dismiss this count is premised on the argument that because AEC was the only signatory to the Agreement of Guaranty, it is the only entity properly named in the breach of contract claim. Moreover, defendants· maintain that because the 1998 revised Agreement of Guaranty refers only to the "accrual" of interest, it "does not provide any deadline for the payment of accrued interest and reflects that interest was not currently due, but instead would continue to accrue." Patrick Henry Hotel Defendant's Memorandum, at 5. Although the thought is not further developed, the apparent suggestion is that the Agreement of Guaranty does not require the actual payment of interest so long as AEC is willing to acknowledge the amount that (at any given time) is due and owing.

There are two significant defects in defendants' argument. Putting aside the reluctance of a court to construe a contract so as to deprive a party of its share of the expected benefits, defendants ignore the July 13, 1993 Letter Agreement, which specifically undertook to pay interest, beginning on September 1, 1993, "and on the first day of each month thereafter," to the Trusts. The second and related flaw stems from defendants' failure to recognize that the interlocking nature of the various Patrick Henry partnerships subjects each of the Patrick Henry Hotel defendants to liability for the acts and omissions of the others.[17]

---

**17.** The parties argue at some length over whether the court should apply the law of Massachusetts or that of New York. Lawson argues that the court should apply Massachusetts choice-of-law principles as it is the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts follows the "interest analysis" or "most significant relationship" test of *Restatement (Second) of Conflict of Laws. See Choate, Hall & Stewart v. SCA Servs., Inc.,* 378 Mass. 535, 541, 392 N.E.2d 1045 (1979). Defendants argue that New York law governs all claims as New York is the jurisdiction where most of the parties reside and do business. It is true that the

Under the law of New York and Delaware, the states in which the Patrick Henry partnerships are registered, as well as under the law of Massachusetts, a partnership is liable for, and bound by, the acts and omissions of its partners. *See Del. Code Ann. Tit.* 6, § 15–305(a) ("A partnership is liable for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with authority of the partnership."); *id.* § 15–306(a) ("[P]artners are liable jointly and severally for all obligations of the partnership."). *See also Great Lakes Chem. Corp. v. Monsanto Co.,* 96 F.Supp.2d 376, 391 (D.Del.2000) ("General partners … are liable jointly and severally for the partnership."). Similarly, New York law states that the liability of partners for partnership contracts is joint and several; each partner is liable for the whole amount of the debt of the partnership, and not merely his or her proportionate share.[18] *See McKinney's Partnership Law* § 25; *Midwood Dev. Corp. v. K 12th Assocs.,* 146 A.D.2d 754, 537 N.Y.S.2d 237, 239 (1989). The law is similar with respect to tort liability.

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

*McKinney's Partnership Law* § 24. *See also McKinney's Business Corp. Law* § 1505(a) ("Each shareholder, employee or agent of a professional service corporation shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or by any person under his direct supervision and control while rendering professional services on behalf of such corporation."). Where there are allegations of insolvency, the New York courts have held that individual partners and stockholders are proper parties to the litigation. *See St. James Plaza v. Notey,* 166 A.D.2d 438, 560 N.Y.S.2d 672, 673 (1990).[19]

---

AEC Guaranty provides that: "[t]his Agreement of Guaranty shall be construed in accordance with the laws of the State of [New York]." On the other hand, the July 13, 1993 Letter Agreement, which has no choice-of-law clause, has the greatest immediate impact on the Trusts' claims. The Letter Agreement was signed in New York by the defendants and then ratified by Lawson in Massachusetts. Under the "significant relationship" test, the Letter Agreement is governed by Massachusetts law. *See Hendricks & Associates, Inc. v. Daewoo Corp.,* 923 F.2d 209, 213 n. 3 (1st Cir.1991) (parties' agreement had a more significant relationship to Massachusetts than to New York where plaintiff was a Massachusetts corporation, negotiation of the contract took place mostly in Massachusetts, subsequent communications between the parties were directed to Massachusetts, and plaintiff received payment through a Massachusetts bank). Except where noted, I have abstained from the fray as I perceive no appreciable difference in result whichever state's law is applied.

18. "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." *McKinney's Partnership Law* § 20.

19. Massachusetts law is of similar effect. Under the Uniform Partnership Act, as under previous common-law, partners are subject to joint and several liability for debts of the

■ There is a reciprocal lapse in the plaintiff's theory of the case, which assumes that the Patrick Henry Hotel defendants are presently liable for breaches of both the Letter Agreement and the Agreement of Guaranty. With respect to the Agreement of Guaranty, plaintiff can point to no damages accruing from the defendants' threat to walk away from AEC's obligations. Hence, there is (as yet) no actual case or controversy involving the Agreement of Guaranty, only the anticipation of a breach (if and when HSBC moves against the assets of the Trusts). Massachusetts does not recognize (outside of a UCC context) a cause of action for a renunciation or repudiation of a contract before a party's performance comes due. *See Thermo Electron Corp. v. Schiavone Construction Co.*, 958 F.2d 1158, 1164 (1st Cir.1992). *See also Cavanagh v. Cavanagh*, 33 Mass.App.Ct. 240, 243–244 & n. 6, 598 N.E.2d 677 (1992) (noting a few exceptions, mostly equitable, that are not applicable here). While New York law is less rigid in this regard, New York does not recognize an action for the anticipatory breach of an executory contract for the payment of money. *See Scherer v. Equitable Life Assurance Society of U.S.*, 190 F.Supp.2d 629, 632–633 (S.D.N.Y.2002), *rev'd on other grounds*, 347 F.3d 394 (2nd Cir.2003). *See also Stuart Leventhal, FZUS, Inc. v. Franzus Company, Inc.*, 1988 WL 132868 (S.D.N.Y.).[20]

*Covenant of Good Faith and Fair Dealing*

■ Count III of the Second Amended Complaint alleges a breach of the covenant of good faith and fair dealing. "Every

contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co. v. Commissioner of Ins.*, 406 Mass. 354, 362 n. 9, 548 N.E.2d 188 (1990), quoting *Kerrigan v. Boston*, 361 Mass. 24, 33, 278 N.E.2d 387 (1972). Under the covenant "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–472, 583 N.E.2d 806 (1991). Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *Hartford Acc. & Indemnity Co. v. Millis Roofing & Sheet Metal, Inc.*, 11 Mass.App.Ct. 998, 999–1000, 418 N.E.2d 645 (1981); *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass.App. Ct. 390, 404, 578 N.E.2d 789 (1991) (same), *rev'd on other grounds*, 412 Mass. 703, 592 N.E.2d 1289 (1992). While a simple breach of contract is unlikely to be found to violate the covenant, *Nagel v. Provident Mut. Life Ins. Co.*, 51 Mass.App.Ct. 763, 768–769, 749 N.E.2d 710 (2001), Jubelt's threat that the Patrick Henry Hotel defendants would cause HSBC to move against the Trusts' assets if Lawson persisted in his attempts to assert the contractual rights of the Trusts under the Letter Agreement, is as fitting an example as one could imagine of the type of conduct that the covenant of good faith and fair dealing is intended to deter.

*Unjust Enrichment*

Lawson's alternative theory of unjust enrichment (Count IV) deserves but pass-

---

partnership, including both contractual obligations and damages for torts committed by individual members in conducting the partnership business. *See* G.L. c. 108A, §§ 13, 15; *Bachand v. Vidal*, 328 Mass. 97, 100, 101 N.E.2d 884 (1951); *First Nat'l Bank of New Bedford v. Chartier*, 305 Mass. 316, 322, 25 N.E.2d 733 (1940); *Fennell v. Peterson*, 225

Mass. 598, 599, 114 N.E. 744 (1917); *Kirkland Construction Co. v. James*, 39 Mass.App. Ct. 559, 560 n. 3, 658 N.E.2d 699 (1995).

**20.** The Trusts had completed performance by extending the guarantees and were simply waiting to be paid; this is a classic example of an executory contract.

ing mention. To satisfy the five elements of unjust enrichment, a plaintiff must show "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 294–295 (D.Del.2000), citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del.Ch. 1999). While the doctrine does not require a contractual or fiduciary relationship between the parties as a prerequisite of suit, *Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 78 n. 1 (1st Cir.2001), where a contract governs the parties' relationship, it provides the measure of the plaintiff's rights. *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003). As Lawson has an adequate remedy at law (money damages) against the Patrick Henry Hotel defendants for any alleged breach of the Letter Agreement, the claim of unjust enrichment is superfluous.[21]

*Fraud and Deceit*

■■■ In Count II of the Second Amended Complaint, Lawson alleges that the defendants made knowing false representations,[22] and that he justifiably relied on these representations to the detriment of the Trusts. Second Amended Complaint ¶ 42. To establish a claim of fraud, a plaintiff must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982), quoting *Barrett Assocs. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867 (1963). A statement of a promissory or predictive nature is actionable if it can be shown that the maker never intended to carry out the promise or knew that the prediction was false when it was made. *People v. Ashley*, 42 Cal.2d 246, 262–264, 267 P.2d 271 (1954) (Traynor, J.); *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 709–710, 563 N.E.2d 188 (1990); *Commonwealth v. Lepper*, 60 Mass.App.Ct. 36, 44, 798 N.E.2d 1030 (2003). A statement of opinion may also be actionable where the maker's knowledge of the subject matter is so superior that a reasonable recipient would understand the opinion as an assertion of fact. *Stolzoff v. Waste Systems International, Inc.*, 58 Mass.App.Ct. 747, 759, 792 N.E.2d 1031 (2003). The statements, among others, that the Patrick Henry Hotel defendants intended to secure the Letter of Credit with a mortgage on the Hotel and with their own assets, that these entities had sufficient funds to satisfy the obligations of the Agreement of Guaranty, and that the sale of the Hotel would generate a sufficient surplus to pay off the Demand Note, could be found by a trier of fact to have been false and to have been known as

---

**21.** The Second Amended Complaint articulates no theory under which Bishop could be said to have been unjustly enriched as there is no allegation that he received any of the proceeds of the Letter of Credit.

**22.** Defendants make the argument that the fraud allegations of the Second Amended Complaint do not satisfy the heightened pleading standard of Fed.R.Civ.P. 9(b). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud shall be stated with particularity." The First Circuit has interpreted the Rule to require "specification of the time, place, and content of an alleged false representation." *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980). I am satisfied that the Second Amended Complaint remedies any deficiencies of its predecessors and pleads the details of the alleged fraud with enough "who, what, when, and where" to survive scrutiny under Rule 9(b).

such by the defendants when the statements were made.

██ Fraud is a concept which by "universal recognition ... is to be construed very broadly." 2 Sand Siffert, Loughlin & Reiss, *Modern Federal Jury Instructions* ¶ 44.01, at 44–11 (2003). "The term 'false or fraudulent pretenses' means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth and that were made with the intent to defraud. They include actual, direct false statements as well as half-truths and the knowing concealment of facts." *First Circuit Pattern Jury Instructions: Criminal* § 4.12 (1998). *See also Beck v. Prupis*, 162 F.3d 1090, 1096 (11th Cir.1998) ("[M]aterial omissions can be the basis for a claim of fraud if they are intended to create a fraudulent representation."). In this vein, the failure of the Patrick Henry Hotel defendants to disclose the existence of the prior encumbrances on the Hotel (which made it impossible for them to keep their promise to secure the Letter of Credit by pledging the Hotel as collateral) could be found by a trier of fact to constitute a willful deceit. *See Commonwealth v. Bannon*, 254 Mass. 320, 323, 150 N.E. 7 (1926).[23]

### Promissory and Equitable Estoppel

██ Counts VI and Count VII of the Second Amended Complaint plead promissory and equitable estoppel. These are two different theories of law. Equitable estoppel involves reliance on misrepresentations of past or present facts; promissory estoppel entails detrimental reliance on statements of future intent. *See Boylston Development Group, Inc. v. 22 Boylston Street Corp.*, 412 Mass. 531, 543 n. 17, 591 N.E.2d 157 (1992). The inclusion of these theories in the Second Amended Complaint is a redundancy. The estoppel doctrine is based on legal concepts antedating the modern doctrine of consideration. These concepts permit the equitable enforcement of a "contract" where, despite the absence of consideration, a plaintiff is able to show detrimental reliance on another's promises or representations, *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 760–761, 384 N.E.2d 176 (1978), or where a non-signatory to a contract who has enjoyed the contract's rights and benefits seeks to repudiate his reciprocal obligations. *See InterGen N.V. v. Grina*, 344 F.3d 134, 145–146 (1st Cir. 2003). Where, as here, there is no allegation of the absence of a binding agreement, the estoppel doctrine is superfluous, and

---

**23.** Count V of the Second Amended Complaint alleges negligent misrepresentation. A defendant is liable for negligent misrepresentation "if in the course of his business, he supplies false information for the guidance of others in their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure to exercise reasonable care or competence in obtaining or communicating the information." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 60 n. 25, 809 N.E.2d 1017 (2004), quoting *Restatement (Second) of Torts* § 552(1) (1977). "Negligent misrepresentation differs from an action for fraud because 'liability for misrepresentation does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff.'" *Id.*, quoting *Kitner v. CTW Transp., Inc.*, 53 Mass.App.Ct. 741, 749, 762 N.E.2d 867 (2002). Under New York law, proof of a negligent misrepresentation claim requires a showing of a "special relationship" between the plaintiff and defendant. *See American Protein Corp. v. AB Volvo*, 844 F.2d 56, 64 (2d Cir.1988); *Fleet Bank v. Pine Knoll Corp.*, 290 A.D.2d 792, 736 N.Y.S.2d 737, 741 (2002). While the fiduciary relationship that is alleged to have existed between Lawson and Bishop would seem sufficient to satisfy New York law, the allegations in the Second Amended Complaint refer exclusively to intentional acts and omissions.

Counts VI and VII will be dismissed for that reason.[24]

*Fiduciary Duty*

Count VIII of the Second Amended Complaint alleges a breach of fiduciary duty on the part of Bishop, stemming from his allegedly conflicted roles as an investment advisor to Lawson and as a director and funds seeker for AEC and AEI. Bishop's motion to dismiss this count is based principally on the jurisdictional arguments that have been rejected earlier in this opinion. Bishop's ancillary argument that the allegation of breach of fiduciary duty is too lightly plead to conform to the heightened pleading standard of Rule 9(b) is misdirected. Rule 9(b) applies only to "averments of fraud or mistake." If a cause of action is not enumerated in Rule 9(b), a complaint need "satisfy only the simple [notice pleading] requirements of Rule 8(a)." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (no heightened pleading standards for employment discrimination cases). *See also Educadores Puertorriqueños en Acción v. Hernández,* 367 F.3d 61, 66–67 (1st Cir.2004) (same, civil rights cases).

*Massachusetts Chapter 93A*

 It is true, as defendants argue, that in Count IX (the Chapter 93A claim) Lawson fails to allege facts supporting the "business" or "commerce" element of G.L. c. 93A, § 11. *See First Enterprises, Ltd. v. Cooper,* 425 Mass. 344, 347–348, 680 N.E.2d 1163 (1997) (a violation of section 11 requires proof that the acts complained of were perpetrated in a business context). It is apparent, however, from the reference in the count to a demand letter that the claim is being brought pursuant to section 9 of Chapter 93A and not section 11. A demand letter is a condition precedent of a section 9 action. *Spilios v. Cohen,* 38 Mass.App.Ct. 338, 342, 647 N.E.2d 1218 (1995). It is, however, irrelevant to an action under section 11. *Kerlinsky v. Fidelity & Deposit Co. of Maryland,* 690 F.Supp. 1112, 1117 (D.Mass.1987), *aff'd,* 843 F.2d 1383 (1st Cir.1988). A section 9 action is appropriate in this case, as Lawson's testimony that his job as Trustee is to "carry out the orders" of the beneficiaries (Lawson is quoted in the Patrick Henry Hotel defendants' Supplemental Submission), makes clear that the Trusts are nominee trusts, and that any injuries inflicted by the defendants have been suffered by the individual beneficiaries, and not by the Trusts as legal entities. *See Roberts v. Roberts,* 419 Mass. 685, 687–688, 646 N.E.2d 1061 n. 2 (1995) (identifying the characteristic features of a typical nominee trust). Defendants' remaining argument that a Consumer Protection Act count must conform to Rule 9(b)'s heightened pleading standard, while it has some support in older case law, is foreclosed by *Swierkiewicz.*[25]

*Statute of Limitations*

 Defendants finally maintain that Lawson's claims must be dismissed on

---

**24.** Plaintiff's prayer for equitable relief has been previously allowed in part and remains part of his potential relief should he prevail on his claims at law.

**25.** While a Chapter 93A claim sounds in fraud ("unfair or deceptive acts"), *Swierkiewicz* "sounded the death knell for the imposition of a heightened pleading standard except in cases in which either a federal statute or specific Civil Rule requires that result." *Her-* *nández,* 367 F.3d at 66. While G.L. c. 93A, § 9(3), requires specificity, it does so in the demand letter and not (necessarily) in the pleadings. *See Halper v. Demeter,* 34 Mass. App.Ct. 299, 302 n. 5, 610 N.E.2d 332 (1993). In any event, I have found the underlying allegations of fraud to be sufficiently plead in the Second Amended Complaint. *See* n. 22, *supra.*

statute of limitations grounds because of his lack of diligence. They argue that where Lawson was told (in 1993) that "the guarantees would be in force for only a few months," that the Letter of Credit would be refinanced within "a few months," and that the Trusts were fully secured by the Hotel and the assets of the Patrick Henry Hotel defendants, Lawson should have been alerted to the fact that none of these things were true when the interest payments stopped in 1994. (The underlying Complaint was not filed until October of 2002).

Under Massachusetts law, a breach of contract claim must ordinarily be brought within six years of the act constituting the breach. G.L. c. 260, § 2.[26] Tort claims are generally subject to a three-year statute of limitations, while Consumer Protection Act claims must be brought within four years. G.L. c. 260, §§ 2A and 5A. "Where summary judgment is sought on the basis of a statute of limitations, once the defendant establishes that the time period between the plaintiff's injury and the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the plaintiff bears the burden of alleging facts which would take his or her claim outside the statute." *McGuinness v. Cotter,* 412 Mass. 617, 620, 591 N.E.2d 659 (1992).

"[A] cause of action accrues on the happening of an event likely to put the plaintiff on notice." *Hendrickson v. Sears,* 365 Mass. 83, 89–90, 310 N.E.2d 131 (1974). *See also Rotella v. Wood,* 528 U.S. 549, 553–554, 120 S.Ct. 1075, 145 L.Ed.2d

1047 (2000) (same). Statutes of limitations, however, are tolled under G.L. c. 260, § 12 (as they are under the federal fraudulent concealment doctrine), "if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means for acquiring knowledge of such facts." *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 106, 406 N.E.2d 678 (1980). The statute of limitations under the federal common-law doctrine of fraudulent concealment is tolled "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part.'"[27] *Salois v. The Dime Savings Bank of N.Y.,* 128 F.3d 20, 25 (1st Cir.1997), quoting *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

Whether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue. *See Santiago Hodge v. Parke Davis & Co.,* 909 F.2d 628, 633 (1st Cir.1990) ("The determination of when appellees had knowledge of 'both the injury and its connection with the act of defendant,' is a question of fact."); *Riley v. Presnell,* 409 Mass. 239, 240, 565 N.E.2d 780 (1991) ("[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact."). *Cf. Young v. Lepone,* 305 F.3d 1, 8–9 (1st

---

**26.** In New York, "an action upon a contractual obligation or liability, express or implied," must also be commenced within six years. *See McKinney's N.Y. CPLR* § 213(2).

**27.** Insofar as Bishop is concerned, Massachusetts law goes further than federal law in relieving a plaintiff of any duty to investigate where the facts upon which a cause of action is based are concealed from the plaintiff by a

breach of the fiduciary duty of full disclosure. *Demoulas v. Demoulas Super Markets, Inc.,* 424 Mass. 501, 519–520, 677 N.E.2d 159 (1997). *See also Lattuca v. Robsham,* 442 Mass. 205, 213, 812 N.E.2d 877 (2004) ("[A] cause of action for breach of fiduciary duty does not accrue until the beneficiary has actual knowledge of the fiduciary's breach.").

Cir.2002) (whether "storm warnings" were sufficient to place an investor on inquiry notice should be determined as a matter of law only when the underlying facts are either admitted or undisputed).

According to Lawson, he was misled by the repeated assurances offered by Bishop and Jubelt that the Trusts were fully secured and would be paid all sums owing once the Hotel was sold or refinanced, and that therefore the "wrong" was not "over and done with" until the January 3, 2002 meeting in Boston when he was informed by Jubelt that the Patrick Henry Hotel defendants had no intention (or ability) of honoring their obligations under the Agreement of Guaranty or the Letter Agreement. *See Blanchette v. Cataldo,* 734 F.2d 869, 876–877 (1st Cir.1984) (a statute of limitations will be tolled where a "continuous course of fraudulent conduct" conceals prior wrongful acts). A jury might well determine that Lawson should have had his guard up from the moment the interest payments under the Letter Agreement ceased, or it might well find that Lawson, however naively, reasonably relied on the blandishments served up by Bishop and Jubelt. But on this record, it is a jury, and not a court of law, that will make that determination.

## *ORDER*

For the foregoing reasons, defendants' motions to dismiss for lack of personal jurisdiction are *DENIED.* The motion to dismiss Count I (breach of contract) is *DENIED* as to the Letter Agreement and *ALLOWED* without prejudice as to the Agreement of Guaranty. The motions to dismiss Count II (fraud and deceit) and Count III (good faith and fair dealing) are *DENIED.* The motions to dismiss Count IV (unjust enrichment), Count V (negligent misrepresentation), Count VI (promissory estoppel), and Count VII (equitable estoppel) are *ALLOWED.* Bishop's motion to dismiss Count VIII (breach of fiduciary duty) is *DENIED.* The motions to dismiss Count IX (Chapter 93A) are also *DENIED.*

SO ORDERED.